777 F.2d 113
 39 Fair Empl.Prac.Cas. 658,
38 Empl. Prac. Dec. P 35,719,
40 Empl. Prac. Dec. P 36,153, 54 USLW 2271,
4 Fed.R.Serv.3d 490
 Charles GOODMAN, Ramon L. Middleton, Romulus C. Jones, Jr.,
and Lymas L. Winfield, on their own behalf and on
behalf of others similarly situated,
and
United Political Action Committee, an unincorporated
association, Dock Meeks, David Dantzler, John
Hicks, III, individually and on behalf
of all others similarly situated
v.
LUKENS STEEL COMPANY, and International Steelworkers of
America (AFL-CIO), and Local 1165, United
Steelworkers of America (AFL-CIO), and
Local 2295, United
Steelworkers of
America (AFL-CIO).
Appeal of UNITED STEELWORKERS OF AMERICA, AFL-CIO-CLC, and
its Local Unions 1165 and 2295, Appellants in 84-1478.
Appeal of LUKENS STEEL COMPANY, Appellant in 84-1509.
 Nos. 84-1478, 84-1509.
 United States Court of Appeals,
Third Circuit.
 Argued June 11, 1985.
Decided Nov. 13, 1985.
As Amended Nov. 22, 1985.
Rehearing and Rehearing En Banc Jan. 7, 1986.
 
 Julia Penny Clark, (argued), Robert M. Weinberg, David M. Silberman, Bredhoff & Kaiser, Washington, D.C., Bernard Kleiman, Chicago, Ill., Carl Frankel, Pittsburgh, Pa., for appellants United Steelworkers of America, AFL-CIO-CLC, and Local Unions 1165 and 2295.
 Jerome A. Hoffman (argued), Mark A. Klugheit, Steven B. Feirson, Dechert Price & Rhoads, Philadelphia, Pa., for appellant Lukens Steel Co.
 William H. Ewing (argued), Arnold P. Borish, Daniel Segal, Leslie A. Hayes, Hangley Connolly Epstein Chicco Foxman & Ewing, Philadelphia, Pa., for appellees Charles Goodman, et al.
 Before WEIS, GARTH and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 This appeal is from the grant of injunctive relief and liability findings in a wide-ranging employment discrimination class action. We conclude that: (1) the same period of limitations applies in Sec. 1981 claims as in those under Sec. 1983; (2) class representatives who were not discriminated against in initial work assignments may not represent those who were; (3) on remand, consideration should be given to appointment of an appropriate representative and possible reinstatement of findings; (4) the unions violated Title VII and Sec. 1981 by failing to assert racial bias as grievances; (5) the limitations period for a Title VII charge against a union begins only after it is named in an EEOC proceeding and not on the date that a charge is brought against the employer alone in a state proceeding; (6) a finding of discrimination in denying incentive pay was clearly erroneous where the evidence demonstrates the action was taken solely on economic grounds; and (7) other findings of discrimination by the district court were not clearly erroneous. Accordingly, we affirm, reverse, and remand in part.
 
 
 2
 After a lengthy bench trial, the district judge found for plaintiffs on several counts alleging discrimination in employment, and therefore entered a remedial order, reserving assessment of damages for future proceedings. On the other counts, the court concluded that the evidence was inadequate to support the plaintiffs' claims and entered judgment for defendants. Defendants appeal the orders adverse to them.[1]
 
 
 3
 In 1973, class action plaintiffs filed this massive suit on behalf of current and past employees of the Lukens Steel Company, alleging violations of 42 U.S.C. Sec. 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. Plaintiffs sought both injunctive relief and damages.
 
 
 4
 Defendant Lukens is an independent steel producing company with its principal facility in Coatesville, Pennsylvania. Since 1966, its work force has ranged between approximately 4200 and 5300 employees; of these the hourly employees numbered between 2600 and 3900. From 1967 to 1978, the percentage of black employees in the hourly work force varied between 21.8 and 24.1. Lukens' hourly employees had been represented by Locals 1165 and 2295 of the United Steelworkers of America, and the unions are listed as defendants together with the company.
 
 
 5
 The district court observed that work at Lukens requires skills which are unique to its specialized products. With a few limited exceptions, the "majority of the Lukens hourly work force start from scratch, and are trained on the job." Partially as a consequence of the need for highly specific skills, the company has a general policy of promoting from within its workforce. The district court found that to some extent current disparaties between white and black employees are a reflection of historical discrimination existing well before the statutory limitations period applicable in this lawsuit.
 
 
 6
 Plaintiffs developed their case by a combination of statistical and anecdotal evidence. After the compilation of an extensive record, the court found evidence of discriminatory practices by the company in the following categories:
 
 
 7
 1. Initial job assignments to higher paying craft jobs were skewed in favor of whites. Blacks also were assigned in higher percentages than whites to "pool" positions, which had seniority provisions inferior to those in the "subdivisions."
 
 
 8
 2. Evidence focusing on transfers to more desirable craft positions demonstrated that whites were favored over blacks by a substantial margin.
 
 
 9
 3. Incentive pay was denied to workers in the predominantly black crews in the Pit Subdivision, although it was given to other specialized crews composed mainly of whites.
 
 
 10
 4. Lukens discriminated against black workers by discharging a higher percentage of black employees during their probationary period.
 
 
 11
 5. The company discriminated against blacks in denying them promotion to salaried positions in management.
 
 
 12
 6. Lukens tolerated harassment of black employees by whites and failed to take appropriate steps to curb such behavior, thereby encouraging workers to believe such conduct would go unpunished.
 
 
 13
 The district court also determined that the unions were guilty of discriminatory practices in:
 
 
 14
 1. Failing to challenge discriminatory discharges of probationary employees.
 
 
 15
 2. Failing and refusing to assert instances of racial discrimination as grievances.
 
 
 16
 3. Tolerating and tacitly encouraging racial harassment.
 
 
 17
 The court further found that plaintiffs had failed to present adequate proof of discrimination in the following areas:
 
 
 18
 1. The seniority system.
 
 
 19
 2. Manning of the new Strand-cast facility (with the exception of class representative Ramon L. Middleton).
 
 
 20
 3. Shift assignments, including Sundays and holiday work, as well as overtime pay.
 
 
 21
 4. Discipline (excluding discrimination in discharge of probationary employees).
 
 
 22
 5. Awards for employee suggestions for improvement in plant operation.
 
 
 23
 6. Processing grievances by the unions insofar as the complaints centered on the number of grievances which the locals presented initially and pursued through arbitration. In addition, the lower rate of successful outcomes for black employees' grievances did not show racial discrimination.
 
 
 24
 The court also directed individual relief for class representatives Goodman, Winfield, Jones, Middleton, and Dantzler, but denied the individual claims of Dock L. Meeks, and John R. Hicks III.
 
 
 25
 The court issued orders against the company and the unions enjoining racial discrimination in the specific areas in which violations of Title VII and Sec. 1981 had been found and directing certain remedial measures. Notice to class members was ordered, and a tentative trial date was set for the individual claims.
 
 
 26
 Both the company and the unions have appealed the various findings against them, challenging both legal and factual determinations made by the district court. Plaintiffs have not appealed the rulings on which they or the class were unsuccessful.
 
 I.
 
 27
 THE STATUTE OF LIMITATIONS FOR SECTION 1981 CLAIMS
 
 
 28
 Because there is no specified federal statute of limitations applicable to Sec. 1981 cases, the district court was required to use the state limitations period most analogous to the civil rights cause of action. Johnson v. Railway Express Agency, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). In a Memorandum Opinion issued on June 16, 1975, the district court concluded that the appropriate period was the six years set forth in Pa.Stat.Ann. tit. 12, Sec. 31, rather than the two year period "for injury wrongfully done to the person" as set out in Pa.Stat.Ann. tit. 12, Sec. 34.
 
 
 29
 In this determination, the district judge anticipated our decision some two years later in Meyers v. Pennypack Woods Home Ownership Ass'n., 559 F.2d 894 (3d Cir.1977), where we applied the six year general statute of limitations in a housing discrimination case brought under sections 1981 and 1982. See also Davis v. United States Steel Supply, 581 F.2d 335 (3d Cir.1978) (six year statute of limitations applicable to Sec. 1981 employment discrimination claim).
 
 
 30
 Although the district judge was correct in forecasting that we would adopt a six year limitation period in an employment case, his prescience, like ours, was limited. Neither he, nor this court, foresaw the Supreme Court's ruling that all Sec. 1983 cases should be governed by a uniform statute of limitations--that provided by the states for personal injury. Wilson v. Garcia, --- U.S. ----, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). That ruling requires us to reexamine our earlier decisions on the appropriate statute of limitations in Civil Rights cases.
 
 
 31
 In Polite v. Diehl, 507 F.2d 119 (3d Cir.1974) (in banc ), we discarded the notion of applying a single limitations period to all Sec. 1983 cases and chose instead to look to the relief sought and the particular injury alleged. A claim alleging bodily injury was governed by the two year Pennsylvania statute but one which was more akin to a contract action came under the six year limitation. Hence, under Polite v. Diehl differing statutes of limitations would be applied to a variety of claims in one suit.
 
 
 32
 Although the court discussed only the Sec. 1983 claims, it noted that plaintiff did formulate causes of action under Sec. 1981. 507 F.2d at 121, n. 2. In any event, the Polite rationale of looking to the facts in each case and then searching for the most analogous state statute was followed in Sec. 1981 cases, as well as those brought under Sec. 1983. See Davis v. United States Steel, 581 F.2d at 338, 341 n. 8; Meyers v. Pennypack Woods Home Ownership Ass'n., 559 F.2d at 903 n. 27.
 
 
 33
 We later determined that the six year statute of limitations applied in Sec. 1983 claims of (1) sex discrimination in employment, Knoll v. Springfield Township School Dist., 699 F.2d 137 (3d Cir.1983), vacated and remanded, --- U.S. ----, 105 S.Ct. 2065, 85 L.Ed.2d 275 (1985), on remand 763 F.2d 584 (3d Cir.1985); (2) termination of employment without due process, Perri v. Aytch, 724 F.2d 362 (3d Cir.1983); (3) discharge from employment in violation of the First Amendment, Fitzgerald v. Larson, 741 F.2d 32 (3d Cir.1984); and (4) termination of employment contract for exercise of First Amendment rights, Skehan v. Trustees of Bloomsburg State College, 590 F.2d 470 (3d Cir.1978).
 
 
 34
 Wilson v. Garcia completely undermined the rationale we employed in Polite as we were quick to recognize. Smith v. City of Pittsburgh, 764 F.2d 188 (3d Cir.1985), reviewed our earlier decisions in light of Wilson and applied Pennsylvania's two year statute of limitations for personal injuries to a Sec. 1983 claim of employment termination without due process. In view of the previous unsettled law in this and other circuits, in Smith we also determined that Wilson v. Garcia should be applied retroactively.
 
 
 35
 Had the case at hand been brought under Sec. 1983 rather than Sec. 1981, the statute of limitations question would be answered by Wilson. This case, however, involves discrimination in private employment to which Sec. 1983 does not apply, and therefore the issue is whether the same statute of limitations used under Sec. 1983 should also apply to Sec. 1981.
 
 
 36
 The Wilson v. Garcia analysis begins with a reference to 42 U.S.C. Sec. 1988, which determines the "rules of decision applicable to Civil Rights claims." Because no federal statute of limitations has been provided for such claims, Sec. 1988 approves the use of state law to provide the appropriate rule. The reference to state law, however, occurs only after analysis of the claim using federal standards. In characterizing Sec. 1983 claims for statute of limitations purposes, the court must consider the elements of the cause of action and Congress' purpose in providing it. Wilson, --- U.S. at ----, 105 S.Ct. at 1493.
 
 
 37
 In deciding the issue presented here, we find it most significant that Sec. 1988 applies not only to Sec. 1983 but to Sec. 1981 and the other reconstruction Civil Rights Acts as well. Section 1988 by its terms applies to "the jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this Title, and of Title 'Civil Rights,' and of Title 'Crimes,' for the protection of all persons in the United States in their civil rights."
 
 
 38
 In this context, we do not consider relevant that Sec. 1981 was originally enacted in 1866, reenacted in 1870, and later included in the 1874 codification, while Sec. 1983 was the subject of separate legislation in 1871. See Runyon v. McCrary, 427 U.S. 160, 168 n. 8, 96 S.Ct. 2586, 2593 n. 8, 49 L.Ed.2d 415 (1976); Mahone v. Waddle, 564 F.2d 1018, 1030-31 (3d Cir.1977). Both sections are to be analyzed under the broad provision of Sec. 1988, which is "a directive to select, in each state, the one most appropriate statute of limitations." Wilson, --- U.S. at ----, 105 S.Ct. at 1947. In this choice, we should be guided by "federal interests in uniformity, certainty, and the minimization of unnecessary litigation" over the limitations period as well as by the nature of the federal Civil Rights remedy, and the prevention of potential state discrimination against it.
 
 
 39
 In concluding that state statutes for personal injury were the most appropriate for use in Sec. 1983 cases, the Supreme Court believed that the enacting Congress viewed civil rights actions as analogous to state tort claims. In this connection, one might argue, as does the dissent, that since Sec. 1981 on "its face relates primarily to racial discrimination in the making and enforcement of contracts," Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 459, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975), the state statute of limitations applying to suits for breach of contract is the most appropriate one. See Wilson v. Sharon Steel Corp., 549 F.2d 276, 280 (3d Cir.1977).
 
 
 40
 We are not persuaded by that argument because it does not recognize the broad sweep of Sec. 1981, see Mahone v. Waddle, nor is it consistent with the fundamental reasons underlying Wilson v. Garcia. There, the Court emphasized Sec. 1983's derivation from the Fourteenth Amendment, which recognizes the "equal status of every person;" that all persons shall be accorded the full privileges of citizenship; and that no person should be deprived of life, liberty or property "without due process." Wilson, --- U.S. at ----, 105 S.Ct. at 1948. As the Court said, "[a] violation of that command is an injury to the individual rights of the person." Id.
 
 
 41
 Those concepts apply equally to actions under Sec. 1981. Present day Sec. 1981's predecessor was founded on the Thirteenth Amendment that allows "neither slavery nor involuntary servitude" to exist any longer. It is difficult to imagine a more fundamental injury to the individual rights of the person than the evil that comes within the scope of that amendment. Also of significance is that in Runyon v. McCrary, the Supreme Court accepted the use of a state's personal injury statute of limitations in a Sec. 1981 case. 427 U.S. at 180-82, 96 S.Ct. at 2599-2600.
 
 
 42
 Moreover, in its reenactment of Sec. 1981 in 1870, Congress looked to constitutional authority embodied in the Fourteenth, as well as in the Thirteenth Amendment. Croker v. Boeing Company, 662 F.2d 975, 987 (3d Cir.1981) (in banc ); see also General Building Contractors Ass'n., Inc. v. Pennsylvania, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Consequently, much of the body of law developed under the Fourteenth Amendment is helpful in the interpretation of Sec. 1981.
 
 
 43
 A substantial overlap exists in the types of claims brought under sections 1981 and 1983. A plaintiff may press an allegation of intentional racial discrimination under either section when state action is present. A Sec. 1983 case of intentional racial discrimination in employment filed in Pennsylvania against a state agency is governed by the two year personal injury statute. See Knoll v. Springfield Township School Dist., 763 F.2d 584 (3d Cir.1985). Application of Pennsylvania's six year statute of limitations where the same claim is brought under Sec. 1981 would lead to a bizarre result.
 
 
 44
 Our first opinion in Knoll, 699 F.2d 137, 144, expressed our doubt that Congress would have intended a differing limitations period depending on whether the defendant was a state official sued under Sec. 1983 or a private individual in a Sec. 1981 action. The same conclusion is appropriate where the identical claim may be brought under either of these Reconstruction Civil Rights Acts. See Jackson v. City of Bloomfield, 731 F.2d 652 (10th Cir.1984). Therefore, because employment discrimination cases under Sec. 1983, regardless of their affinity to contractual actions, are now governed by the personal injury statute of limitations, and because the same considerations which led to that judgment are also present in Sec. 1981 cases, we conclude that the same limitations period applies.[2]
 
 
 45
 In taking this position, we are in agreement with Supreme Court in Wilson that the personal injury limitation period is unlikely to be fixed in such a way as to discriminate against federal Civil Rights claims. In addition, the factors characterized as "practical considerations" by Justice O'Connor's dissent in Wilson --which include the desirability of uniformity, certainty, and minimization of litigation prior to reaching the merits--are best served by applying the same statute of limitations to all of the Reconstruction Civil Rights cases.[3]
 
 
 46
 As we noted earlier, the reasoning employed by the Supreme Court in Wilson is inconsistent with the Polite approach as used in Davis and Pennypack Woods. This court has consistently held that one panel may not overrule an earlier panel's decision. See Third Circuit Internal Operating Procedure VIII C. However, we have recognized that this principle must yield when a panel opinion is in conflict with an intervening Supreme Court precedent. "Where, however, a holding of this Court is overruled or rejected by the Supreme Court, IOP 8c does not require in banc consideration to align this court's jurisprudence with Supreme Court teaching." Rubin v. Buckman, 727 F.2d 71, 74 (3d Cir.1984) (Garth, J. concurring). See also West v. Keve, 721 F.2d 91, 93 (3d Cir.1983); Geraghty v. United States Parole Commission, 719 F.2d 1199, 1209 (3d Cir.1983). The rationale used in Davis cannot co-exist with Wilson, and accordingly does not bind us here.
 
 
 47
 We hold, therefore, that the personal injury statute of limitations of the forum state supplies the most analogous statute of limitations for actions brought under Sec. 1981. For the reasons set forth in Smith v. City of Pittsburgh, we also conclude that our decision should be given the customary retroactive effect. See Fitzgerald v. Larson, 769 F.2d 160 (3d Cir.1985).
 
 
 48
 Our holding affects some but not all of the findings made by the district court. Plaintiffs contend that the two year statute of limitations would not change the district court's decree because it was based on violations of Title VII as well as Sec. 1981.[4] However, because the court did not consider the facts separately under Sec. 1981 and Title VII, we conclude this lack of discrete analysis requires a partial remand.
 
 
 49
 As noted in Croker v. Boeing, 662 F.2d 975 (3d Cir.1981), Sec. 1981 liability is not co-extensive with that under Title VII, and the remedies provided under the two statutes are "separate, distinct, and independent." See Johnson v. Railway Express Agency. In the absence of a specific finding fixing liability under each statute, we are unable to say whether application of the two year statute of limitations would result in a difference in the court's decree on two of its liability determinations. It is conceivable, for example, that events within the six year statute of limitations used for the Sec. 1981 claims might have been considered by the court in finding liability under Title VII beyond its limitations period.
 
 
 50
 In finding discrimination in transfers to salaried positions, the district court relied heavily on the low percentage of blacks promoted to foreman jobs in the years 1969 and 1970--between three and four years before the suit was filed. The court found that the evidence "overwhelmingly establishes that Lukens discriminated in the selection of foremen until at least 1971." 580 F.Supp. at 1145. For the years 1971 through 1978, however, approximately 26% of the foreman promotions were given to blacks--not substantially different from their 29% representation in the work force during those years.
 
 
 51
 The record contains other anecdotal and statistical evidence on this point which should be evaluated by the district judge in the first instance. We are mindful that a finding of class-wide violation is supported only when the evidence shows that discrimination was the company's standard operating procedure, rather than something which occurred only in a few isolated incidents. See International Bhd. of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In such a situation, the trial judge's appraisal is particularly important.
 
 
 52
 Similarly, the district court's finding that the company tolerated racial harassment within the work force must be reevaluated on remand. The court stated that it had considered more than 100 incidents or practices, many of which "predated the limitation period" and about 35 of which "occurred within the limitations period or shortly before--e.g. 'in the late 1960s' or 'between 1965 and 1970'." 580 F.Supp. at 1147. The court recognized the critical inquiry as "assessing the conditions which prevailed during the limitations period." Id.
 
 
 53
 Some of the instances described in detail by the district judge occurred before 1971 and some thereafter. We are unable to determine from the record what effect the application of the two year statute of limitations for the Sec. 1981 claims would have on the district court's conclusion with respect to the harassment charge. Consequently, it too will require reexamination by the trial court.
 
 
 54
 We have surveyed the findings on the other issues and conclude that they would not be affected by the two year limitations period. Naturally, in the portion of the case remaining to be tried for assessment of individual damages, the two year statute would apply.
 
 II.
 CLASS CERTIFICATION AND CLASS REPRESENTATIVES
 A.
 
 55
 A second major issue presented in this case is that of class representation. In this area, too, subsequent decisional law requires review of the district court's ruling in a somewhat different light than that which prevailed at the time the court acted.
 
 
 56
 In a Memorandum of June 16, 1975, the district court certified a class of "all black persons employed by the defendant Lukens Steel Company at any time on or after June 14, 1967." This class includes persons whose employment was within the six year statute of limitations for Sec. 1981 applied by the district court. To that extent, the class definition must be narrowed.
 
 
 57
 A review of the class allegations in the complaint and the court's certification order shows that the suit was conceived as a broad, "across the board" attack on racial discrimination at Lukens. As class representatives, the court approved Charles Goodman, Ramon L. Middleton, Romulus C. Jones, Jr., Lymas L. Winfield, Dock Meeks, David Dantzler, and John R. Hicks, III. Each of these plaintiffs asserted specific claims of discrimination practiced against them by the company and, in several instances, by the unions as well.
 
 
 58
 Because of the nature of the claims, the court concluded that any ruling on the appropriateness of damages was premature, and therefore certified the class under Fed.R.Civ.P. 23(b)(2). See Kyriazi v. Western Electric Co., 647 F.2d 388 (3d Cir.1981). Possible definition of a class under Rule 23(b)(3) for assessment of damages was reserved. After making its liability determinations, the court directed counsel to prepare a proposed form of notice to class members.
 
 
 59
 On appeal, defendants contend that the district court erred in allowing the individual plaintiffs who asserted injury from specific discriminatory practices to represent a broad class alleging violations beyond those of the named individuals.
 
 
 60
 Initially, we observe that contrary to the defendants' contentions, the issue here is one of compliance with the provisions of Rule 23, not one of Article III standing. Each of the named plaintiffs has presented claims of injury to himself and has alleged facts which present a case or controversy under the Constitution. Cf. O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) ("If none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").
 
 
 61
 The thrust of the defendants' challenge is that the injuries to the named plaintiffs are in many instances not the same as those advanced on behalf of the class. In essence, defendants contend that the allegations of the named plaintiffs do not present "questions of law or fact common to the class" and that their "claims ... are [not] typical of the claims ... of the class" as required by Rule 23(a)(2) and (3). For this reason, we need only consider whether the named plaintiffs meet the requirements of Rule 23.
 
 
 62
 The expansive "across the board" class action attack on employment discrimination gained currency in a series of cases typified by Johnson v. Georgia Highway Exp. Inc., 417 F.2d 1122 (5th Cir.1969), and Payne v. Travenol Lab., Inc., 565 F.2d 895 (5th Cir.1978). See also Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239 (3d Cir.1975); Mack v. General Elec. Co., 329 F.Supp. 72 (E.D.Pa.1971); Rutherglen, Title VII Class Actions, 47 U.Chi.L.Rev. 688 (1980). In General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), however, the Supreme Court pulled in the reins by insisting on actual, not presumed, compliance with the typicality and commonality provisions of Rule 23.
 
 
 63
 The Supreme Court pointed out that a named plaintiff's proof of his personal claim would not necessarily establish that the discriminatory practice was pervasive or was reflected in other employment activities. As the Court said, "[i]f one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential companywide class action. We find nothing in the statute to indicate that Congress intended to authorize such a wholesale expansion of class-action litigation." Id. at 159, 102 S.Ct. at 2371.
 
 
 64
 In Falcon, the named plaintiff alleged that he had been denied a promotion because he was a Mexican-American. The Court determined that he could not represent a class of Mexican-Americans attacking discrimination in hiring. The Court cited East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), in which named plaintiffs who were not qualified as over-the-road drivers could not represent a class of qualified drivers who complained of discrimination. Because the named plaintiffs "could have suffered no injury as a result of the alleged discriminatory practices, ... they were, therefore, simply not eligible to represent a class of persons who did allegedly suffer injury." 431 U.S. at 403-04, 97 S.Ct. at 1897.
 
 
 65
 Scott v. University of Delaware, 601 F.2d 76 (3d Cir.1979), presented a similar problem. There, a former faculty member whose contract was not renewed alleged that he was a victim of racial discrimination and sued under sections 1981 and 1983 as well as Title VII. He sought to represent a subclass of applicants seeking initial faculty appointments who were also allegedly victimized by racial considerations. The district court entered judgment on the merits for the defendant on both the individual and class claims.
 
 
 66
 We determined that the plaintiff could not represent a class contesting the university's hiring procedures. Clearly, he had suffered no harm from discrimination in hiring practices since he had initially obtained a position. In that situation, absent class members might be harmed by the preclusive effect of the district court's judgment. Therefore, we concluded that the court had a duty to "consider carefully the requirement of fair and adequate protection" to the absent class members, despite the lack of a cross appeal of the class certification ruling by the defendant. Scott, 601 F.2d at 83.[5]
 
 
 67
 As is clear from Scott, assessment of the adequacy of representation initially must focus on any potential conflicts of interest between the named individuals and the class. On this record, we find no divergence that would impair the incentive of the named plaintiffs in vigorously prosecuting all aspects of the claims that are otherwise found to be adequately represented. Scott v. University of Delaware, 601 F.2d at 85. See Rutherglen, Notice, Scope, and Preclusion in Title VII Class Actions, 69 Va.L.Rev. 11 (1983).[6] The defendants have raised additional allegations of error in class certification, however, which must also be addressed.
 
 
 68
 The class representatives alleged a variety of instances of discrimination by the company and the unions in various employment practices, covering most of the claims presented by the class. Included were promotion (Middleton, Winfield, Jones), incentive pay (Meeks), discharge (Goodman, Hicks, Dantzler), harassment (Meeks), inadequate union representation (Middleton, Dantzler, Meeks), testing (Meeks), seniority system (Meeks), discipline (Dantzler), and manning of the new Strand-Cast facility (Middleton).
 
 
 69
 Defendants contend that in a number of areas the class representatives' specific allegations are distinct from those of the class as a whole. For example, none of the named plaintiffs were discharged during the probationary period. Nonetheless, some do allege that racial bias resulted in their discharge. Even though the alleged discrimination occurred after their probationary period had passed, we conclude that the typicality of their claims makes them adequate representatives under Rule 23.
 
 
 70
 The defendants' contentions are not completely without merit however. Even under an expansive view of representation, discrete areas of alleged bias exist in which the record does not demonstrate the required commonality and typicality of the class complaints with those of the individual representatives. A footnote in Falcon suggests that "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify" a broad class if the bias manifested itself "in the same general fashion, such as through entirely subjective decisionmaking processes." 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15. We do not regard the case at hand as meeting those requirements. The findings of the district court, which rejected some of the plaintiffs' claims, belie the existence of a "general policy" of discrimination and plaintiffs did not produce "significant proof" of such a scheme.
 
 
 71
 The district court found discrimination in the initial assignment of Lukens' newly-hired employees. To be actionable, the discriminatory practice must exist during the applicable limitations period. All of the named plaintiffs, however, were originally hired outside the limitations period, and therefore, none have a viable complaint about discrimination in initial assignment. Thus, no representative adequately represents the class in this particular claim. See Hill v. AT & T Technologies, Inc., 731 F.2d 175 (4th Cir.1984).[7]
 
 
 72
 Because in this instance a qualified class representatives is lacking, the findings applicable to it must be vacated. Economical use of judicial resources, however, requires that some thought be given to whether the work of district court and counsel with respect to this claim may yet be salvaged.
 
 B.
 
 73
 We begin by acknowledging the realities of class suits, a sometimes neglected approach in this field. In a massive class action such as the one at hand, it is counsel for the class who has the laboring oar. The class representatives furnish the factual basis to invoke the jurisdiction of the court and provide the outline of the controversy, but the lawyers shape the claims for adjudication by the compilation of factual and expert testimony and the presentation of statistical and documentary evidence.
 
 
 74
 That work was performed in this case by thoroughly competent counsel as to the claims in which the court found for plaintiffs as well as those where it ruled for defendants. We do not prejudge the issue but merely note the distinct possibility that the evidence presented would not have varied one iota had a qualified representative for each claim been present from the inception of the suit. If that possibility is indeed the fact, then another suit filed on such a claim by a newly qualified class representative would produce a trial that would simply repeat the previous one. That result would yield no discernable benefit to anyone but would generate substantial loss in time for court, counsel, and parties.[8]
 
 
 75
 To obviate such unnecessary duplication, on remand the district court should explore the possibility of intervention by qualified class representatives, followed by a proceeding to determine if the findings previously reached may be reinstated. That solution was suggested by the Court of Appeals for the Fourth Circuit in Hill v. Western Elec. Co., Inc., 672 F.2d 381 (4th Cir.1982). See Note, Reinstating Vacated Findings in Employment Discrimination Class Actions: Reconciling General Telephone Co. v. Falcon with Hill v. Western Electric Co., 1983 Duke L.J. 821.
 
 
 76
 Intervention is still permissible even at this stage, see United Airlines, Inc. v. McDonald, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), and a class action determination in some instances may be made even after appeal. McLaughlin v. Wohlgemuth, 535 F.2d 251, 252 n. 2 (3d Cir.1976).
 
 
 77
 As the Hill court observed, practical fairness should guide the district court in evaluating the propriety of intervention. For example, a witness who testified about a particular practice and who otherwise meets the necessary test may be a likely representative. See Lilly v. Harris-Teeter Supermarket, 720 F.2d 326 (4th Cir.1983). If, however, no proper class representative is available, then that claim must be dismissed as to the class. See Scott v. City of Anniston, Alabama, 682 F.2d 1353 (11th Cir.1982); Carpenter v. Stephen F. Austin State University, 706 F.2d 608 (5th Cir.1983). Cf. Vuyanich v. Republic Nat'l Bank of Dallas, 723 F.2d 1195 (5th Cir.1984).
 
 
 78
 Assuming that a proper class representative is appointed, the next step would be to determine whether the findings from the original trial may be reinstated. In reaching a decision on this question, the district court must consider whether either side will be prejudiced. This will require determination of whether those findings would have been different had the new class representative been on board at that time. An intervenor or new class representative seeking to salvage the original findings has the burden of proving that the prior defect in class representation did not affect those determinations. In the event of such proof, the previous findings may be reinstated.
 
 
 79
 On remand, the district court has the benefit of hindsight. As the court of appeals said in the Hill case, "[t]o the extent inadequacy is based solely upon lack of sufficient identity of interest, any presumed adverse effect on the merits stemming from this may in fact be utterly belied by the outcome." 672 F.2d at 389. See also Scott v. University of Delaware, 601 F.2d at 87 n. 22. If the results of the original trial were favorable to the class, then there may be no reason to assume that reinstatement would be prejudicial to the class.
 
 
 80
 The district court also has the responsibility of determining whether it would be unfair to defendants to reinstate the findings. That the net effect is to revive an adverse result is not in itself a sufficient showing of prejudice. Rather, the court should consider whether the defendants' preparation and tactics would have been different had other class representatives been in place at the earlier trial. In other words, the question is would defendants have conducted the litigation differently in some material way absent the defect in representation in the prior proceeding. See Dickerson v. United States Steel Corp., 582 F.2d 827 (3d Cir.1978). Cf. Mullaney v. Anderson, 342 U.S. 415, 417, 72 S.Ct. 428, 429, 96 L.Ed. 458 (1952) (Joinder of new parties permissible where their earlier presence would not "have in any way affected the course of the litigation").
 
 
 81
 We do not limit the district court in its inquiry but only point to a few of the considerations that should be examined.
 
 C.
 
 82
 Plaintiffs contend that the United Political Action Committee--an unincorporated association composed predominantly of black citizens in the vicinity of the Lukens plant, some of whom are employed by the company--should be permitted to act as a class representative. The record in this case does not contain adequate factual material to justify the committee's capacity to act as a class representative. See General Telephone Co. of the Southwest v. Falcon.
 
 
 83
 Accordingly, we conclude that on this record no named plaintiff could adequately represent the class in the claim of racial discrimination in initial work assignments. On remand, the district court may consider the intervention and appointment of appropriate class representatives as well as possible reinstatement of the original findings.
 
 III.
 CLAIMS AGAINST THE UNIONS
 
 84
 The district court concluded that the evidence did not support the plaintiffs' claims about racial discrimination in the general handling of grievances by the unions, including references to arbitration. The delay in processing grievances and the decision to abandon those of a less serious nature were, in the court's view, practices legitimately complained of by both black and white workers. However, the court did find that the unions discriminated against the plaintiff class in violation of both Sec. 1981 and Title VII.
 
 
 85
 Collective bargaining agreements beginning in 1965 had prohibited the company from discriminating against any employee, probationary or permanent, on racial grounds. Nevertheless, although they knew that blacks were being discharged at a disproportionate rate during the probationary period, the locals failed to file grievances challenging that practice, pursuant to a union policy of not grieving complaints of probationary employees.[9]
 
 
 86
 The unions were reluctant to assert racial bias as a basis for a grievance even when they believed that element was implicated. The court found this policy to perpetuate the discriminatory environment and "render the non-discrimination clause in the collective bargaining agreement a dead letter." 580 F.Supp. at 1160.
 
 
 87
 The unions argued before the district court that simple inactivity could not make them liable under Title VII or Sec. 1981. The district court rejected that contention, but went on to hold that "the evidence in this case proves far more than mere passivity on the part of the unions." The court further commented that "[a] union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances of success on other issues, or in deference to the perceived desires of its white membership, is liable under both Title [VII] and Sec. 1981 regardless of" its leadership's favorable disposition toward blacks. Id. at 1160.
 
 
 88
 On appeal, the unions repeat their argument that mere passivity should not subject them to liability because such inaction is not within the scope of Sec. 703(c) of Title VII addressing union responsibility. That section of the Act provides in pertinent part that it is an unlawful employment practice for a union:
 
 
 89
 "(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
 
 
 90
 * * *
 
 
 91
 * * *
 
 
 92
 (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."
 
 
 93
 42 U.S.C. Sec. 2000e-2(c).
 
 
 94
 The union argues that passivity does not "cause" the employer to discriminate and faults Macklin v. Spector Freight Systems, Inc., 478 F.2d 979 (D.C.Cir.1973), for holding a union liable without any reference to the text of the statute. Although the Macklin case has been criticized, see Larson, Employment Discrimination, Sec. 44.50, other cases have echoed its premise that there is an affirmative duty on the part of the unions to combat discrimination in the workplace. See, e.g., Bonilla v. Oakland Scavenger Co., 697 F.2d 1297 (9th Cir.1982); Farmer v. ARA Services, Inc., 660 F.2d 1096 (6th Cir.1981); Romero v. Union Pacific R.R., 615 F.2d 1303 (10th Cir.1980); Donnell v. General Motors Corp., 576 F.2d 1292 (8th Cir.1978); Carey v. Greyhound Bus Co., Inc., 500 F.2d 1372 (5th Cir.1974).
 
 
 95
 In McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the plaintiffs contended that disproportionate discipline had been imposed on them because of their race. They alleged that the union "had acquiesced and/or joined in" the employer's discrimination. The Court did not accept the union's defense that in representing a number of employees it is sometimes necessary to compromise the grievance of one.
 
 
 96
 "We reject the argument. The same reasons which prohibit an employer from discriminating on the basis of race among the culpable employees apply equally to the union; and whatever factors the mechanisms of compromise may legitimately take into account in mitigating discipline of some employees, under Title VII race may not be among them."
 
 
 97
 427 U.S. at 285, 96 S.Ct. at 2581.
 
 
 98
 The case against the unions here is stronger than one of mere acquiescence. The district court found that the unions intentionally avoided asserting claims of discrimination. In so doing, the unions violated the duty of fair representation owed to their members. See Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); see also, Note, Union Liability for Employer Discrimination, 93 Harv.L.Rev. 702 (1980).
 
 
 99
 By shirking their responsibility for presenting grievances based on discrimination, the unions also violated the duty to enforce the collective bargaining agreement. See Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81 (3d Cir.1982). The deliberate choice not to process grievances also violated Sec. 703(c)(1) of Title VII because it discriminated against the victims who were entitled to representation. The district court's finding of intentional discrimination properly supports the claims under Sec. 1981 as well. We therefore find no error in the district court's assessment of liability against the unions.
 
 IV.
 
 100
 STATUTE OF LIMITATIONS AS TO THE TITLE VII CLAIMS AGAINST THE UNIONS
 
 
 101
 Plaintiff Hicks filed charges against Lukens before the Pennsylvania Human Rights Commission on December 2, 1971. The unions were not named in that complaint. On January 28, 1972, however, Hicks along with named plaintiffs Goodman, Meeks, and Middleton filed broad charges of discrimination against Lukens, the International Union, and Local 1165 with the EEOC. The Commission deferred these charges to the Pennsylvania Human Relations Commission on February 16, 1972, and filed them on May 7, 1972. Local 2295 was first named in an amended charge filed by plaintiff Meeks on June 13, 1972.
 
 
 102
 Because the statute allows the state agency sixty days to dispose of a claim, 42 U.S.C. Sec. 2000e-5(c), the earliest that Hicks' original charge could be considered filed with the EEOC was January 31, 1972. Based on that date, the district court found that the limitation period for Title VII claims against the unions began on April 6, 1971. That determination is correct only if the initial filing in the state Commission against Lukens is construed to include claims against the unions as well.
 
 
 103
 In Ostapowicz v. Johnson Bronze Co., 541 F.2d 394 (3d Cir.1976), we held that the scope of a Title VII action is defined by the limits of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. That case, however, involved only one defendant, and we did not hold that the scope of the investigation could include unnamed parties.
 
 
 104
 Glus v. G.C. Murphy Co., 629 F.2d 248 (3d Cir.1980), held that charges against an unnamed international union could be adjudicated because the original complaint before the EEOC had named a local union whose interests were the same and the international had received notice. Neither of those two conditions apply here. The charge filed by Hicks was not against a union, but against the employer. We do not find the commonality of interest and actual notice which would make Glus applicable. Therefore, no charges were cognizable against the unions until the January 28, 1972 filing with the EEOC.
 
 
 105
 In Mohasco Corp. v. Silver, 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 2491 n. 16, 65 L.Ed.2d 532 (1980), the Court held that "a complainant in a deferral State [as is Pennsylvania] ... need only file his charge within 240 days of the alleged discriminatory employment practice in order to insure that his federal rights will be preserved." Plaintiffs ask that they be given the benefit of this 240 day rule. That would produce a limitations period commencing June 2, 1971, somewhat longer than that advocated by the unions. Although we can foresee another case in which a plaintiff might be entitled to a longer period, in light of the plaintiffs' concession here, we conclude that the June 2 starting date is appropriate.
 
 
 106
 We do not find a different limitation period applicable to Local 2295. The identity of interest and notice provisions of Glus are applicable in this situation; therefore, Local 2295 will be governed by the same effective limitations date, June 2, 1971.
 
 
 107
 The correction of the limitations date for Title VII claims against the unions will not affect the injunctive relief directed by the district court. It might, however, make a difference in the assessment of damages, and accordingly we feel obligated to make a ruling on the point.
 
 V.
 INCENTIVE PAY FOR THE PIT CREWS
 
 108
 The district court found that the company's policy of denying incentive pay to workers in the open hearth pits while making it available to other workers amounted to discrimination. The open hearth pit crews were predominantly black. Their assignment was to prepare molds to receive molten metal, pour the metal, and remove the molds after the metal had hardened. At a higher physical elevation in the plant, workers on the melting "floor" placed the raw materials into the furnaces for melting and supervised that process. These predominantly white crews received incentive pay, as did other workers in the Lukens facility.
 
 
 109
 The court reasoned that "[g]iven the fact that the company paid incentive bonuses to the 'floor' personnel, ... [its] refusal to accord the same benefit to the pit personnel had no legitimate justification. I find that this was a clear instance of racial discrimination." 580 F.Supp. at 1138.
 
 
 110
 In reviewing factual findings made by a district court, we apply the clearly erroneous standard set out in Fed.R.Civ.P. 52(a). As the Supreme Court stated in Anderson v. City of Bessemer City, --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), this standard is used "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." Id. at ----, 105 S.Ct. at 1512. The Rule clearly requires deference to the findings of the trial judge, but it does not relieve the court of appeals from its responsibility to correct findings of fact when it is left "with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 111
 As an appellate court, we have an advantage over the trial judge in that the parties have had ample opportunity after trial to review the record in detail and point out specific references to support their position. Moreover, the attention of the litigants is restricted to a narrow area in which they hope the challenge may be successful. That process differs from the broad gauge approach which is followed in the district court, where the requests for findings are being compiled in the first instance from voluminous testimony and exhibits and without any indication of the trial court's ultimate rulings. This is particularly true in a case as massive as this one.
 
 
 112
 After a painstaking review of every record reference to which the parties have cited us, we have come to the conclusion that in this instance, a mistake was made.
 
 
 113
 It is undisputed that the incentive pay issue was one of long standing which began before the limitations period. Both testimony and documents disclose that the union on a number of occasions had asked the company to grant incentive pay to the pit crew. The employer's response was consistent--it would include the pit crew in the incentive plan only if the company was given the opportunity to reduce the size of the crew. On each occasion, and there were several, when the employer submitted this proposition to the members of the pit crew, they rejected it. Not only did the pit crews turn down the company's proposal, but the crane crews in the pit--another seniority subdivision--did so as well.
 
 
 114
 One union official who discussed the company's proposal with the workers recalled that about equal numbers of black and white workers were present at a meeting to vote on the proposal. Although plaintiffs suggest that other groups receiving incentive pay also had agreements on crew size, testimony reveals that these arrangements were not comparable to those with the pit and crane crews.
 
 
 115
 Another union witness described the particularly close relationship among the workers in the pit crew. The men consistently presented a united front to the company and were most solicitous of each member's safety and well being. When one reads the testimony against this background, it is understandable why the pit crew would not sacrifice the jobs of its members in exchange for higher pay for those who would retain their positions.
 
 
 116
 The evidence is equally clear why the employer insisted on the trade-off. Company officials testified that the pit crews were overmanned and that the facilities of the plant were limited. Any increase in efficiency had to come from a reduction in crew size. In these circumstances, incentive pay would not be economically advantageous to the company because the capacity of the facility had already been reached and increased efficiency by the already overabundant manpower could not result in greater production.
 
 
 117
 The testimony does not support any inference that denial of incentive pay was racially inspired. The company's position on a trade-off was consistently maintained and was unrelated to race. That conclusion finds reinforcement in the company's experience with the die shop workers. Early collective bargaining agreements showed that both the pit crew and die shop group were not included in the incentive pay plan. However, when the die shop employees agreed that the company would be under no restriction as to crew size, they did receive incentive pay.
 
 
 118
 The record citations to which plaintiffs have referred us do not furnish any basis for concluding that the company's reason for denying incentive pay was pretextual. Indeed, the weakness on this point in the otherwise vigorous and well-documented plaintiffs' brief is eloquent in itself.
 
 
 119
 After our review, we conclude that the finding on incentive pay to the pit crews is clearly erroneous, and on this claim, the judgment of the district court must be reversed.
 
 VI.
 LUKENS OTHER CONTENTIONS
 
 120
 In addition to the matters which have been discussed above, Lukens has raised other claims of error. It contends that the trial judge erred by impermissibly shifting the burden of proof to the defendant. We find no merit to this argument. In the introduction to his opinion, the trial judge reviewed the leading cases of Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). He stated clearly that the burden of proof was on plaintiffs. We are not persuaded that the casual references in the opinion to which Lukens points should be interpreted as contradicting the earlier unambiguous allocation of the burden of proof.
 
 
 121
 The court's opinion similarly displayed a thorough understanding of the difference between disparate impact and disparate treatment cases and of the relevant evidence under each theory. The defendant takes exception to the district judge's comment that
 
 
 122
 "One must be careful not to over-categorize in this context. The analytical distinctions ... are of only limited utility. The ultimate questions to be answered are essentially the same in all employment discrimination cases: Has the defendant caused a given employee or group of employees to be discriminated against? ... Is the action or conduct complained of justifiable ...?"
 
 
 123
 580 F.Supp. at 1121.
 
 
 124
 We find no fault with these observations. In Dillon v. Coles, 746 F.2d 998 (3d Cir.1984), we similarly commented on excessive preoccupation with the various formulae used in an employment discrimination case and observed that they are simply tools designed to aid in the analysis of evidence. The ultimate question remains whether the defendant has discriminated. The presumptions and shifting burdens are merely an aid--not ends in themselves. When direct evidence is available, problems of proof are no different than in other civil cases. See Trans World Airlines, Inc. v. Thurston, --- U.S. ----, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985); United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). If judges lose sight of the ultimate question, the analysis intended to aid in the process will instead have become a hinderance.
 
 
 125
 Lukens also argues that the district court misapplied evidence by failing to recognize that a statistical variation in itself does not establish discrimination unless the record also shows the requisite availability of positions and the qualification of the claimants. We do not so read the district court's opinion. In considering the statistical data presented as part of the plaintiffs' case, the court demonstrated its recognition of the limits of such evidence and the caution with which it must be viewed. The court noted that to prevail the class was required to prove that "disparate treatment exists and is the defendant's regular and standard operating procedure." 580 F.Supp. at 1120. In another part of the opinion, the court made clear that it had considered Lukens' "attempts to show that [the plaintiffs'] comparisons are faulty because of factual dissimilarities." Id.
 
 
 126
 We repeat once again that the clearly erroneous rule applies to our review of factual findings, including those based in part on statistical data. Statistical proof in Title VII cases must be evaluated in light of the "surrounding facts and circumstances." International Bhd. of Teamsters v. United States, 431 U.S. 324, 340, 97 S.Ct. 1843, 1857, 52 L.Ed.2d 396 (1977). In Dothard v. Rawlinson, 433 U.S. 321, 338, 97 S.Ct. 2720, 2731, 53 L.Ed.2d 786 (1977), Justice Rehnquist in his concurring opinion wrote, "[i]t is for the District Court, in the first instance, to determine whether these statistics appear sufficiently probative of the ultimate fact in issue.... In making this determination, such statistics are to be considered in light of all other relevant facts and circumstances." See also Holsey v. Armour & Co., 743 F.2d 199, 215 (4th Cir.1984).
 
 
 127
 We have reviewed Lukens' remaining contentions using this standard. We cannot say that the findings made by the district court are clearly erroneous, nor do we find error in the legal guidelines used by the court in reaching these remaining findings. Therefore, the judgment of the district court with respect to the instances of discrimination not previously discussed will be affirmed.
 
 VII.
 SUMMARY
 
 128
 1. The district court's findings that Lukens discriminated in transfers to salary positions and toleration of racial harassment will be vacated and the matters remanded for further consideration in light of our ruling on the appropriate statute of limitations for the Sec. 1981 claims.
 
 
 129
 2. The district court's finding in favor of the class with respect to initial assignments will be vacated and remanded for reconsideration in light of our ruling on class representation.
 
 
 130
 3. The limitations period pertaining to the Title VII claims against the unions shall be adjusted in accordance with the views expressed above.
 
 
 131
 4. The finding of discrimination in the denial of incentive pay for the pit crews is reversed and judgment shall be entered for the defendant on that claim.
 
 
 132
 5. In all other respects, the judgment of the district court will be affirmed.
 
 GARTH, Circuit Judge, dissenting:
 
 133
 I agree with the majority's analysis and disposition of all the issues presented in this appeal except for one. I respectfully dissent from the majority's holding that the statute of limitations for a cause of action under 42 U.S.C. Sec. 1981 is limited in Pennsylvania to two years rather than the six year period applied by the district court.
 
 
 134
 The court today relies on Wilson v. Garcia, --- U.S. ----, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), in which the Supreme Court held that all claims under Sec. 1983 should be subject to a state's corresponding personal injury statute of limitations. Although Wilson does not address Sec. 1981 claims, the court concludes that Wilson's reasoning compels identical limitations treatment for all reconstruction Civil Rights claims. This conclusion is inconsistent with history, precedent, and logic, and in any event is not required by Wilson.
 
 
 135
 While the majority's holding may not bar the civil rights claims asserted in this case, since violations of Sec. 1981 may be found to have occurred within the shorter limitation period, the majority's discussion and holding necessarily will have ramifications far beyond the appeal which we decide today. I therefore write separately to record my disagreement with the majority's analysis.
 
 I.
 
 136
 Prior to Wilson v. Garcia, this court applied a case-by-case analysis in determining which statute of limitations was most appropriate for a particular civil rights cause of action. Polite v. Diehl, 507 F.2d 119 (3d Cir.1974) (in banc). Under this analysis, we have generally held that claims under Sec. 1981 are governed in Pennsylvania by that state's six-year statute of limitations. See, e.g., Davis v. United States Steel Supply, 581 F.2d 335, 341 (3d Cir.1978), cert. denied, 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983); Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 902-03 (3d Cir.1977).
 
 
 137
 In Davis, we held that a Sec. 1981 claim of racial discrimination in employment, the gravamen of which was interference with economic rights and interests rather than personal injury, should be governed by Pennsylvania's six-year limitations period. 42 Pa.Cons.Stat.Ann. Sec. 5527 (Purdon 1982). Unless it has been overruled by Wilson, Davis would appear to control the present case, where the gist of the cause of action is economic rather than bodily injury caused by interference with the employment rights of black workers.
 
 
 138
 Wilson holds that "the federal interests in uniformity, certainty, and the minimization of unnecessary litigation" requires that all Sec. 1983 claims be governed by the same statute of limitations in a given state: that state's personal injury statute. 105 S.Ct. at 1947. Because Wilson looks to Sec. 1988 for its authority to apply state limitations periods in civil rights actions, and Sec. 1988 by its terms covers all of the Reconstruction sections, the majority today concludes that Wilson mandates that all civil rights actions be governed by a state's personal injury limitation period. This conclusion is at best an arguable extension of Wilson's analysis; it is by no means the holding of Wilson or an inexorable outgrowth of the case. In the absence of a square holding which overrules Third Circuit precedent, however, we remain bound by Davis to apply the six-year limitation period. It is not enough if Wilson merely undermines or raises questions about our prior analysis. Until the Supreme Court actually decides the limitation period for a Sec. 1981 claim, or unless Wilson would admit of no other reasonable reading, only an in banc decision of this court can overrule Davis. See Third Circuit Internal Operating Procedures VIII C.[1]
 
 
 139
 A close reading of Wilson reveals that the majority's view is neither an inevitable nor even the most plausible reading of the case. Wilson's holding that all Sec. 1983 claims should be decided in a given state under the same statute of limitations follows from the Supreme Court's view that Sec. 1983 claims are best analogized to state tort actions for personal injuries. Id. at 1947. Having made this analogy as a matter of federal law, the Court adopted New Mexico's three-year personal injury statute of limitations out of deference to the state's judgment regarding "the proper balance between policies of repose and the substantive policies of enforcement embodied in the state cause of action." Id. at 1945.
 
 
 140
 Nothing in Wilson addresses Sec. 1981, which has a different history and purpose. See Section II infra. If Wilson has any effect on this case, therefore, it is merely to suggest that a single, uniform statute of limitations should be applied in each state to all cases under Sec. 1981 instead of the case-by-case approach of Polite. Whether that would be the two-year personal injury period now applied in Pennsylvania for Sec. 1983 claims. Smith v. City of Pittsburgh, 764 F.2d 188 (3d Cir.1985), or some other limitation period dictated by the nature of Sec. 1981, is a question beyond the scope of Wilson. Even if Wilson does require us to select a single statute of limitations for all Sec. 1981 claims, it does not necessarily erase the distinctions between Sec. 1981 and Sec. 1983 recognized in Davis and Meyer.[2] These cases would therefore weigh heavily toward our selection of six years as the most appropriate uniform period of limitations for Sec. 1981 claims. In short, not only does Wilson not require today's result, but it can plausibly be read as support for a uniform six-year statute of limitations for Sec. 1981 claims in Pennsylvania.
 
 II.
 
 141
 An examination of the history, purpose, and application of Sec. 1981 in contrast to the history, purpose, and application of Sec. 1983, supports the conclusion that Pennsylvania's six-year statute of limitations for contract and trespass actions is the most appropriate one to apply to the Sec. 1981 claim before us. While it is true, as the majority notes, that both Sec. 1981 and Sec. 1983 are concerned broadly with protecting the equal legal status of every person before the law, and that there is substantial overlap in the cases that may properly be brought under the two sections, there are still significant differences between the two. In short, Sec. 1983 was conceived, and has been generally applied, as a personal injury statute. Section 1981, however, is more fundamentally concerned with injury to the contractual or economic rights of minorities, and as such should appropriately be governed by the longer contract statute of limitations.
 
 A.
 
 142
 42 U.S.C. Sec. 1981 was originally enacted as section one of the Civil Rights Act of 1866, was re-enacted as Section 16 of the 1870 Act, and was later included in the 1874 recodification. Runyon v. McCrary, 427 U.S. 160, 169 n. 8, 96 S.Ct. 2586, 2593 n. 8, 49 L.Ed.2d 415 (1976). In its present form it provides:
 
 Sec. 1981. Equal rights under the law
 
 143
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 144
 While the "full and equal benefit" and "penalties" clauses give Sec. 1981 broad applicability beyond the mere right to contract, Mahone v. Waddle, 564 F.2d 1018, 1028 (3d Cir.1977), cert. denied sub. nom., City of Pittsburgh v. Mahone, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978), speeches and testimony at the time of Sec. 1981's enactment, demonstrate the predominantly economic focus of Section 1 of the 1866 Act.
 
 
 145
 Concerned with removing the badges and incidents of slavery, the legislators of 1866 believed that if economic freedom was protected, social freedom and equality would follow. Senator Trumbull, who introduced the 1866 Act, specified certain "great fundamental rights" denied to freedmen by former slave states:
 
 
 146
 the right to acquire property, the right to come and go at pleasure, the right to enforce rights in the courts, to make contracts, and to inherit and dispose of property.
 
 
 147
 Cong.Globe, 39th Cong., 1st Sess. 475 (1866), quoted in Jones v. Alfred E. Mayer Co., 392 U.S. 409, 432, 88 S.Ct. 2186, 2199, 20 L.Ed.2d 1189 (1968).
 
 
 148
 The bills' supporters believed that freedom would be valueless to men not assured an equal opportunity to bargain for their labors. Illustrative of this economic concern are the words of Rep. Lawrence of Ohio delivered in a detailed speech to the House:
 
 
 149
 It is idle to say a citizen shall have the right to life, yet deny him the right to labor, whereby he alone can live. It is a mockery to say a citizen may have a right to live, and yet deny him the right to make a contract to secure the privilege and the rewards of labor.
 
 
 150
 Every citizen, therefore, has the absolute right to life, the right to personal security, personal liberty, and the right to acquire and enjoy property. These are rights of citizenship. As necessary incidents of these absolute rights, there are others, as the right to make and enforce contracts, to purchase, hold, and enjoy property, and to share the benefit of laws for the security of person and property.
 
 
 151
 Cong.Globe, 39th Cong., 1st Sess. 1832.
 
 
 152
 On March 2, Rep. Windom of Minnesota stated his understanding of the scope of the bill:
 
 
 153
 Its object is to secure to a poor weak class of laborers the right to make contracts for their labor, the power to enforce the payment of their wages, and the means of holding and enjoying the proceeds of their toil.
 
 
 154
 Id. at 1159.
 
 
 155
 In 1865, the President commissioned Brigadier General Carl Schurz to tour the five most war-ravaged states to report on conditions there and suggest measures to overcome post war problems. In Report of C. Schurz, S.Exec.Doc. No. 2, 39th Cong., 1st Sess. at 21 (1865), Schurz concluded:
 
 
 156
 It is, indeed, not probable that a general attempt will be made to restore slavery in its old form, on account of the barriers which such an attempt will find in its way; but there are systems intermediate between slavery as it formerly existed in the south, and free labor as it exists in the north, but more nearly related to the former than to the latter, the introduction of which will be attempted.
 
 
 157
 This intermediate state between slavery and free labor referred to by General Schurz was created in large part by the Black Codes enacted by Southern states. While specifying that blacks had the right to buy, sell, own and bequeath real and personal property, the right to contract, to sue and be sued, and to testify in court, these rights only related to blacks' relationships with other blacks. The Codes authorized unequal punishment for freedmen's offenses, restricted travel and residence, and established an etiquette of deference to whites. In addition, the Codes severely limited economic rights. Blacks were forbidden the pursuit of certain occupations. They were subject to various master-servant statutes, vagrancy and pauper provisions that incorporated enforced labor, apprenticeship regulations, and elaborate labor contract statutes, especially pertaining to farm labor. Hyman & Wiecek, Equal Justice Under the Law 319-20 (1982).
 
 
 158
 It was within this historical context that the Act of 1866 and the vetoed Freedmen's Bureau Amendment were proposed. The perception of Civil Rights in the 19th century, while encompassing personal safety, was cast largely in economic terms by the definition of legal relationships, responsibilities, and remedies. It is evident, therefore, that Sec. 1981 derived from an Act that was designed to ensure predominantly economic rights for newly freed blacks.
 
 
 159
 Moreover, 42 U.S.C. Sec. 1982, which is recognized as a companion to Sec. 1981, is by its plain language solely addressed to economic concerns. It reads:
 
 
 160
 All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.
 
 
 161
 Reading the two sections in conjunction, the 1866 Congress intended to end all discrimination and guarantee all citizens the opportunity to participate in the free market economy. Citizens were now free to make and enforce contracts for personal services and real and personal property. From their wording and identical legislative history, the two sections have been construed similarly. Both Sec. 1981 and Sec. 1982 reach private conduct. Runyan, 427 U.S. at 170, 96 S.Ct. at 2594. See Johnson v. Railway Express, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975); Tillman v. Wheaton-Haven Recreation Assoc., 410 U.S. 431, 439-40, 93 S.Ct. 1090, 1094-95, 35 L.Ed.2d 403 (1972). Both Sec. 1981 and Sec. 1982 are directed at the same kind of discrimination: racial animus. Jones, 392 U.S. at 426, 88 S.Ct. at 2196. Both sections share a similar purpose, ensuring predominantly economic rights, and have been given similar construction. See Meyers v. Pennypack Woods Home Owners Assoc., 559 F.2d 894 (3d Cir.1977). Therefore, both sections most appropriately belong under a state statute of limitations governing economic and contract actions.
 
 B.
 
 162
 Section 1983, in contrast, reveals a very different legislative history, purpose, and application from Sec. 1981 and Sec. 1982. Section 1983 was enacted by Congress pursuant to Sec. 5 of the fourteenth amendment in order to enforce that amendment. Monroe v. Pape, 365 U.S. 167, 171, 81 S.Ct. 473, 475, 5 L.Ed.2d 492 (1961).
 
 
 163
 42 U.S.C. Sec. 1983 in its revised form reads:
 
 
 164
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 165
 Section 1983 was enacted as section 1 of the Civil Rights Act of 1871. Adicks v. Kress, 398 U.S. 144, 162, 90 S.Ct. 1598, 1611, 26 L.Ed.2d 142 (1969). It arose from and was designed to respond to an entirely different set of circumstances than those which led to the original enactment of what became Sec. 1981. As I have previously observed in discussing Sec. 1981, the 1866 Congress was concerned with granting freedom and equality through economic guarantees which had long been denied the now newly freed blacks. It was economic freedom which enabled a man to be free. The focus was to identify those rights, previously denied, that would enable a person to sustain himself and his family once the mechanism of the master-slave society was dismantled. These concerns stand in sharp contrast to concerns about violence, physical injury and lawlessness that motivated the Congress of 1871.
 
 
 166
 After the passage of the thirteenth amendment and the 1866 Act, Southern resistance to Reconstruction mounted. Ku Klux Klan activity and atrocities increased. White vigilantes were described as having whipped, robbed, and murdered blacks. On March 3, 1871, President Grant, declaring that anarchy reigned in the South and that the states were powerless to control widespread violence, requested emergency legislation. In order to suppress the Klan and provide civil rights protection against official inaction and toleration of private lawlessness, Congress passed the Ku Klux Klan Act, which became known as the Civil Rights Act of 1871. See Brisco v. LaHue, 460 U.S. 325, 340, 103 S.Ct. 1108, 1118, 75 L.Ed.2d 96 (1983).
 
 
 167
 In characterizing all Sec. 1983 claims as personal injury actions for limitations purposes, the Supreme Court looked to "the historical catalyst for the 1871 Act, the campaign of violence and deception in the south fomented by the Ku Klux Klan." Wilson v. Garcia, --- U.S. ----, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985). "The atrocities that concerned Congress in 1871 plainly sounded in tort ...." Id., 105 S.Ct. at 1948. In characterizing claims under Sec. 1981, we should follow the Supreme Court's analysis and look to the very different underlying purpose and historical catalyst for the Act of 1866.
 
 C.
 
 168
 In addition to their contrasting histories and purposes, Sec. 1981 and Sec. 1983 have been applied differently. Section 1983 encompasses a broad range of actions sounding in tort, including injuries under color of state law to a person or his property and infringements of individual liberties. Id. at 1948. Cases under Sec. 1983 "often involve elements that are similar to state causes of action for personal injury." Jones v. United Gas Improvement Corp., 383 F.Supp. 420, 431 (E.D.Pa.1974). See also Harris v. Commonwealth, 419 F.Supp. 10, 14 (M.D.Pa.1976).
 
 
 169
 By contrast, the vast majority of cases brought under Sec. 1981 arise out of some economic relationship consisting of more patterned sorts of behavior, frequently involving documentary proof in the form of employment records. Dudley v. Textron, Inc., 386 F.Supp. 602, 606 (W.D.Pa.1974). Indeed, the plain language of Sec. 1981 supports the Supreme Court's own characterization of the statute: "[Section 1981] on its face relates primarily to racial discrimination in the making and enforcement of contracts." Johnson v. Railway Express, 421 U.S. 454, 459, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975).
 
 
 170
 In addition, a review of the elements of causes of action brought under Sec. 1981 and Sec. 1983 further suggests that the two acts should be construed separately. Section 1983 requires, by its language and purpose, state action, while Sec. 1981 can extend to acts of private discrimination. Mahone v. Waddle, 564 F.2d at 1031; Jones v. Mayer Co., 392 U.S. at 437, 88 S.Ct. at 2202; Johnson v. Railway Express, 421 U.S. at 460, 95 S.Ct. at 1720. Section 1981 also requires racial animus, Jones v. Mayer Co., 392 U.S. at 426, 88 S.Ct. at 2196, as well as discriminatory intent. Croker v. Boeing Co., 662 F.2d 975, 988 (3d Cir.1981) (en banc); Craig v. County of Los Angeles, 626 F.2d 659, 668 (9th Cir.1980), cert. denied, 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981). By contrast, racial animus need not be an element in a Sec. 1983 cause of action, nor is there a requirement of intentional conduct or any other particular state of mind as a prerequisite to recovery. Parratt v. Taylor, 451 U.S. 527, 534-535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1980).
 
 III.
 
 171
 The majority concludes that unless claims under Sec. 1981 are governed by the same statute of limitations as those under Sec. 1983, the federal interest in uniformity and certainty in litigation as expressed in Wilson v. Garcia, --- U.S. ----, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), will be frustrated. The majority further concludes that, since the same facts could in some cases support a claim under either Sec. 1981 or Sec. 1983, applying different statutes of limitation would lead to a "bizarre result." Typescript at 12. While admittedly an overlap of 1981 and 1983 causes of action exists, that is no reason to ignore the significant differences in history, purpose, and application between the two causes of action outlined above. But just as some similarities between Sec. 1981 and Sec. 1983 may be recognized, so too are there differences in dimension between these two actions. These differences reflect traditional distinctions between tort and contract law which have legitimate, practical purposes under both state law and the federal Civil Rights statutes. In that context, I suggest that the majority's concerns about uniformity are misplaced and given greater weight than that to which they are entitled. Therefore, in addition to precedent and history, logic militates against today's holding.
 
 
 172
 The majority bases its uniformity argument largely on 42 U.S.C. Sec. 1988, which provides that state law is to be consulted in setting the period of limitation for all civil rights claims. Wilson, 105 S.Ct. at 1943. Finding it "most significant" that Sec. 1988 applies to both Sec. 1981 and Sec. 1983 at 119, the majority concludes that the federal interest in uniformity in the enforcement of the civil rights statutes requires a common period of limitation.
 
 
 173
 Nothing in Sec. 1988, however, requires that result. The statute only mandates that in cases where the laws of the United States "are not adapted to the object" of enforcing civil rights,
 
 
 174
 the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause ....
 
 
 175
 If anything, this language supports a measure of deference to state law distinctions between tort and contract actions, so long as these distinctions are reflected in differences between and among the civil rights sections, and are therefore consistent with Federal law.
 
 
 176
 In fact, these tort-contract distinctions are real and substantial. First of all, as this court noted in Meyers v. Pennypack Woods Home Owners Assoc., 559 F.2d 894, 903 (3d Cir.1977):
 
 
 177
 "[T]he passage of time is less likely to impede the proof of facts" in a section 1981 and section 1982 action than in a state law physical injury action or a federal action under 42 U.S.C. Sec. 1983, for example, and a longer statute of limitations may be appropriate.
 
 
 178
 (quoting Dudley v. Textron, Inc., 386 F.Supp. 602 (E.D.Pa.1974)).
 
 
 179
 Second, a longer statute of limitation for Sec. 1981 claims relating to economic discrimination might actually reduce federal litigation, as a plaintiff before proceeding in federal court could afford to wait until the disposition of an administrative action--for example, an action brought under the Fair Housing Act or Title VII--which would be more likely to overlap with a Sec. 1981 action than with a Sec. 1983 action.
 
 
 180
 That state legislatures have good reasons for distinguishing between contract and personal injury actions was noted by Justice O'Connor:
 
 
 181
 [T]he legislative judgment to which this Court has traditionally deferred is not some purely arbitrary imposition of a conveniently uniform time limit. For example, a legislature's selection of differing limitations periods for a claim sounding in defamation and one based on a written contract is grounded in its evaluation of the characteristics of those claims relevant to the realistic life-expectancy of the evidence and the adversary's reasonable expectations of repose.
 
 
 182
 Wilson, 105 S.Ct. at 1950 (O'Connor, J., dissenting).
 
 
 183
 Similarly, there is good reason for treating Sec. 1981 claims, which focus on economic discrimination often involving contracts and longer periods of patterned behavior, differently from Sec. 1983 claims, which, by and large, more closely resemble torts for personal injury which result from discrete and more sharply identified events. The federal interest in uniformity and predictability is adequately served by treating alike all claims under a given section; it does not require that all claims under separate and distinct statutes be treated identically.
 
 
 184
 Furthermore, the majority's sought-after "uniformity" is illusory. Even among Sec. 1983 claims, Wilson does not require identical treatment throughout the country, since different states may have different personal injury limitations periods. In fact, in Wilson, a three-year period was applied, rather than the two year period adopted by today's decision. 105 S.Ct. at 1949, or the one year period found appropriated for Mississippi by the Fifth Circuit in Gates v. Sprinks, 771 F.2d 916, 920 (5th Cir.1985). Thus, Wilson defers to state judgment on the appropriate balance of interests in setting the limitation period, even though it results in different periods being applied in Sec. 1983 cases in New Mexico, Pennsylvania, Mississippi, and elsewhere throughout these United States. There is no reason not to defer similarly to state judgments that actions sounding in contract should be governed by a longer limitation period.
 
 
 185
 The majority's concern that applying a longer limitation period for Sec. 1981 would lead to a "bizarre result" is unfounded. It is true that the same nucleus of operative fact sometimes could be characterized as either a Sec. 1981 and/or Sec. 1983 claim and thereby receive different limitations treatment if the six-year statute was applied under Sec. 1981. Such variations, however, are commonplace in the law. In a run-of-the-mill automobile accident case, for example, identical facts could give rise to warranty claims sounding in contract and strict liability claims sounding in tort--each to be governed by a different statute of limitations. This is not thought to be a "bizarre result," and the possibility that the same or similar facts could support causes of action under different Civil Rights statutes is no more "bizarre."
 
 
 186
 Moreover, facts that could support either a Sec. 1981 or a Sec. 1983 claim could frequently also support a claim under Title VII, which has a 300 day limitation period in a deferral state like Pennsylvania. 42 U.S.C. Sec. 2000e-5(e). This disparity is tolerated, however, because Title VII is distinguishable from other Civil Rights provisions, just as Sec. 1981 is distinguishable from Sec. 1983. Title VII covers a narrower range of situations than does Sec. 1981, but is not limited to racial animus and does not require intentional discrimination. "The choice [between Title VII and Sec. 1981] is a valuable one. Under some circumstances the administrative route may be highly preferrable over the litigatory." Johnson v. Railway Express, 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). Moreover, "the remedies available under Title VII and under section 1981, although directed to most of the same ends, are separate, distinct, and independent." Id. Different statutes with different purposes may logically be governed by different statutes of limitation. Total uniformity in limitations periods for civil rights claims is therefore neither possible nor necessarily desirable.
 
 
 187
 In Johnson, 421 U.S. at 463-64, 95 S.Ct. at 1721-22, the Supreme Court stated:
 
 
 188
 Although any statute of limitations is necessarily arbitrary, the length or period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting prosecution of stale ones ....
 
 
 189
 The legislatures of Pennsylvania, New Jersey, Delaware and the Virgin Islands have made such value judgments in distinguishing for limitations purposes between actions brought for contract and personal injury.[3] There is no reason why this court should not respect the recognition by the state legislatures that distinctions should be made, for limitations purposes, between actions for contract and personal injury, and conclude that such distinctions are properly reflected in the application of the civil rights statutes. Indeed, this court has so held. See Davis v. United States Steel Supply, 581 F.2d 335, 339 (3d Cir.1978), cert. denied, 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983); Meyers. Since Wilson does not compel a different result, we should stand by our sound prior analysis. For the foregoing reasons, I respectfully dissent.
 
 SUR PETITION FOR REHEARING
 
 190
 Present: ALDISERT, Chief Judge, SEITZ, ADAMS, GIBBONS, HUNTER, WEIS, GA RTH, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON, and MANSMANN, Circuit Judge s.
 
 
 191
 The petition for rehearing filed by Plaintiffs-Appellees in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 192
 Judge Gibbons would grant rehearing in banc.
 
 
 193
 Judges Garth and Becker would grant rehearing in banc only with respect to the statute of limitations issue, Judge Garth's Statement Sur Petition for Rehearing is attached hereto.
 
 STATEMENT OF JUDGE GARTH
 SUR PETITION FOR REHEARING
 
 194
 I would grant rehearing only on the issue of whether actions pursuant to 42 U.S.C. Sec. 1981 must be governed by a uniform personal injury statute of limitations as are actions pursuant to Sec. 1983 under the rule of Wilson v. Garcia, 105 S.Ct. 1938 (1985). I believe the panel majority in this case wrongly decided this question for three reasons.
 
 
 195
 First. on its face, Wilson v. Garcia only governs actions under Sec. 1983. Even a moderately expansive reading of Wilson would require only that each section of Reconstruction civil rights acts be governed by an appropriate, uniform statute of limitations. The Wilson court focused on the history, purpose, and application of Sec. 1983 in concluding that actions under that section are most appropriately governed by a state's personal injury limitation period. Wilson therefore does not control the disposition of the present case.
 
 
 196
 Second, the history, purpose, and application of Sec. 1981 reflects that the section was conceived and has been applied primarily as a means of protecting economic rights, such as those involving labor, property, and contracts. As such, Sec. 1981 is best governed by the longer statute of limitations provided in most states for actions in contract.
 
 
 197
 Third, the "uniformity" sought by the panel majority in the application of the civil rights laws is nothing less than chimerical. It is quite common for a complaint to join cases of action governed by different statutes of limitations -- whether the joined claims involve tort and contract, federal civil rights claims and state claims, or Sec. 1981 and Sec. 1983 claims. Different statutes of limitation are applied because different sorts of interests are protected by the different provisions, and the states have made policy choices in balancing rights against the practical problems of trying stale claims.
 
 
 198
 Most states have concluded that economically grounded causes of actions will more frequently arise from patterned and well-documented courses of conduct than will claims for personal injury, and that it is therefore fair to bring such economic claims up to six years after they arise. There is no reason we should not respect these policy choices, grounded as they are in real and substantial differences between and among causes of action, in applying civil rights statutes which reflect the same differences.
 
 
 199
 I have more fully set out these reasons with supporting authorities in my dissent from the panel opinion. I have voted to grant rehearing here because I believe that this issue will arise with great frequency in cases brought before the federal courts. Thus, the majority's holding will have far-reaching consequences by unjustifiably barring many cases brought under Sec. 1981 through the application of a shorter personal injury statute of limitations.
 
 
 200
 Because of the importance of this question, I believe full court consideration is warranted.
 
 
 
 [1]
 The district court opinion is reported at Goodman v. Lukens Steel Co., 580 F.Supp. 1114 (E.D.Pa.1984)
 
 
 [2]
 We note that in 1978 and 1982 Pennsylvania's statute of limitations scheme was substantially revised. Claims for injury to economic rights, as well as for personal injuries, are currently subject to a two year limitation. 42 Pa.Cons.Stat.Ann. Sec. 5524
 
 
 [3]
 The plaintiffs argue that under the rule we adopt in this opinion a statute meant to cover only cases involving bodily injury will be applied to actions in which no such injury is alleged. See Meyers v. Pennypack Woods, 559 F.2d at 902. The Supreme Court clearly foresaw the possibility that uniform characterization of all civil rights claims might lead to some seemingly anomalous results under a particular state statutory scheme. See Wilson v. Garcia, --- U.S. at ----, 105 S.Ct. at 1945. That state law interpretations are not fully consistent is an acceptable result when considered in light of the overriding federal interest in uniformity
 
 
 [4]
 The district court determined that as to the claims against the company, the Title VII limitations period began on May 6, 1970, and that finding has not been challenged on appeal. Evidence of disparate treatment under Title VII provides the elements of intentional discrimination under Sec. 1981. See Lewis v. University of Pittsburgh, 725 F.2d 910, 915 n. 5 (3d Cir.1983)
 
 
 [5]
 The defendant in Scott did challenge the propriety of the class certification in both the district court and on appeal
 
 
 [6]
 The fact that some of the named plaintiffs did not prevail on their individual claims does not make them inadequate class representatives. See East Texas Motor Freight v. Rodriguez, 431 U.S. at 406 n. 12, 97 S.Ct. at 1898 n. 12 (1977); International Woodworkers of America v. Chesapeake Bay Plywood Corp., 659 F.2d 1259 (4th Cir.1981)
 
 
 [7]
 Nor do we find appropriate class representatives for one claim resolved in defendants' favor--that in which discrimination in the awards for suggestions made to the company was alleged. That point has not been raised by defendants or plaintiffs, and we leave it for further exploration, if desired, in the district court
 
 
 [8]
 Such a suit would be timely since the commencement of the class action tolled the statute of limitations as to members of the class. See Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983); Edwards v. Boeing Vertol Co., 717 F.2d 761 (3d Cir.1983)
 
 
 [9]
 We reject the unions' contention that the district court's findings were clearly erroneous as to this matter
 
 
 [1]
 Compare Rubin v. Buckman, 727 F.2d 71, 73-74 (3d Cir.1984) (Garth, J., concurring) (in banc hearing not necessary to overrule prior panel when earlier case violated "consistent and explicit" rule and was "obviously in conflict with Supreme Court precedent.")
 
 
 [2]
 While Smith v. City of Pittsburgh, 764 F.2d 188 (3d Cir.1985), discusses Davis v. United States Steel Supply, 581 F.2d 335 (3d Cir.1978), cert. denied, 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983), in following Wilson v. Garcia, --- U.S. ----, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), Smith was a Sec. 1983 case. The Smith court erroneously cited Davis as a Sec. 1983 case decided under the discredited case-by-case approach of Polite. 764 F.2d at 193. In fact, Davis was a Sec. 1981 case, and as such, is not controlled either by Smith or Wilson
 
 
 [3]
 Pennsylvania, New Jersey and the Virgin Islands apply a six-year statute of limitations for contract actions. 42 Pa.Cons.Stat. Sec. 5527 (1981); N.J.Stat.Ann. 2A:14-1 (West Supp.1984); V.I.Code Ann. tit. 5 Sec. 31(3)(A) (1967). Delaware provides for three years. Del.Code. Ann. tit. 10 Sec. 8106 (1975). Pennsylvania, New Jersey, Delaware and the Virgin Islands all apply the shorter two year limitation for actions brought for personal injury. 42 Pa.Cons.Stat. Sec. 5524 (1981); N.J.Stat.Ann. 2A:14-2 (West 1952); Del.Code Ann. tit. 10 Sec. 8119 (1975); V.I.Code Ann. tit. 5 Sec. 31(5)(A) (1984 Supp.)