Majid Ghaidan AL–KHAZRAJI, a/k/a
Majid Al-Khazraji Allan, Appellant

v.

SAINT FRANCIS COLLEGE, John Willoughby, Gervase Cain, Kirk Weixel, John Coleman, Radrique Labrie, Albert Zanzuccki, Adrian Baylock, Marian Kirsch and David McMahon, individually and in their official capacities.

No. 85–3205.

United States Court of Appeals,
Third Circuit.

Argued Dec. 5, 1985.

Decided March 3, 1986.

Rehearing and Rehearing En Banc
Denied April 4, 1986.

Caroline Mitchell (argued), Pittsburgh, Pa., for appellant.

Nick S. Fisfis (argued), Bethel Park, Pa., for appellees.

Before ADAMS, GIBBONS and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

### I.

This is an appeal from a summary judgment entered in favor of the defendants below. Appellant, Majid Ghaidan Al-Khazraji, alleges that he, a U.S. citizen, was denied tenure at St. Francis College on account of his race, religion, and national origin. On appeal, appellant's case is premised on Title VII, 42 U.S.C. § 1981 and pendent state law claims. We affirm the district court as to the Title VII claim, and reverse as to the Section 1981 and pendent claims.

## II.

### FACTS

Majid Ghaidan Al-Khazraji was employed for over five years as an associate professor at St. Francis College in Loretto, Pennsylvania. Al-Khazraji, who was born in Iraq, is a United States citizen and a member of the Muslim faith. He has received advanced academic degrees from Cornell University and the University of Wisconsin.

Al-Khazraji applied for tenure at St. Francis in January, 1978. On February 10, 1978, the Tenure Committee voted to recommend to the Board of Trustees that tenure not be granted. Al-Khazraji was informed of that decision and on February 23, 1978, the Board adopted the Tenure Committee's recommendation.

On March 20, 1978, Al-Khazraji received a one-year written contract from St. Francis for the 1978–1979 academic year. This contract was not renewable beyond May 26, 1979. Al-Khazraji signed this terminal contract.

Although apparently no established procedures existed, Al-Khazraji sought internal review of this adverse decision. He did not at that time take any other action. Christian Oravec, president of St. Francis, and David McMahon, Al-Khazraji's department chairperson, advised him in a series of meetings "not to 'do anything until St. Francis made a final decision on [his] petition for reconsideration of the denial of [his] tenure application.'"[1] Al-Khazraji understood this as a request to refrain from taking action with any outside agency until he had "exhausted all of his options at the college."[2] In September, 1978, the Faculty Senate unanimously voted to permit the Faculty Affairs Committee to review the Tenure Committee's decision. The Faculty Affairs Committee did so and in January, 1979, recommended that the Faculty Senate request reconsideration of

the tenure decision. On February 6, 1979, the Tenure Committee met and decided to not reconsider Al-Khazraji's application. Al-Khazraji worked his last day at the college on May 26, 1979.

On May 10, 1979, Al-Khazraji filed a suit against St. Francis in the Court of Common Pleas of Cambria County, Pennsylvania. In his complaint Al-Khazraji alleged that St. Francis had violated its own tenure guidelines in denying him tenure. He also alleged that the decision was motivated by "bias, prejudice and discrimination," and that the College had improperly considered his "ethnic (Arab) and religious (Muslim) background." This lawsuit was dismissed with prejudice on October 26, 1983, for failure to prosecute. Al-Khazraji did not appeal this dismissal.

In September, 1978, almost seven months after learning of the Tenure Committee's first rejection of his application, Al-Khazraji contacted the Pennsylvania Human Relations Commission ("PHRC") and inquired about his rights under civil rights statutes. At that time, the PHRC did not docket cases which "charged termination as a result of wrongful doing until the termination had taken place. Notification of impending termination at some future date was considered insufficient reason to docket the charge or to proceed with the investigation."[3] Al-Khazraji was told that he could not file a charge with the PHRC until he had worked his last day at St. Francis College. He filed a complaint with PHRC on June 22, 1979, within thirty days of completing his final contract with St. Francis and over one year after he had first been informed of the Tenure Committee's decision. This complaint was deemed simultaneously filed with the Equal Employment Opportunities Commission.

On May 19, 1980, Al-Khazraji's PHRC complaint was dismissed. PHRC notified

1. Affidavit of appellant, 205a.

2. Affidavit of Thelma Griffith-Johnson, former Regional Director of the Pennsylvania Human Relations Commission ["PHRC"], Plaintiff's App. at 202a.

3. Affidavit of Thelma Griffith-Johnson, App. at 202a.

plaintiff of this in a letter, dated May 30, 1980, which gave two reasons for the dismissal. First, because "the alleged act(s) of discrimination occurred beyond the ninety (90) day period permitted by the statute of limitations;" second, because "Prior to filing your complaint, you took civil or criminal action that was based on the same issues as those raised in your complaint." Al-Khazraji did not appeal this dismissal.

On August 6, 1980, the EEOC issued to Al-Khazraji a right to sue letter.

## III.

## THE DISTRICT COURT

On October 30, 1980, Al-Khazraji filed a *pro se* complaint in the United States District Court for the Western District of Pennsylvania against St. Francis College. This complaint alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by the college. He subsequently secured counsel and filed amended complaints naming the members of the Tenure Committee as additional defendants in their individual and official capacities. The amended complaints added allegations that the defendants had violated 42 U.S.C. §§ 1981, 1983, 1985(3), 1986, as well as the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* Al-Khazraji also alleged breach of contract and intentional infliction of emotional distress under Pennsylvania law.

On February 9, 1981, Judge Ziegler dismissed Al-Khazraji's claim under 42 U.S.C. § 1986 as untimely.

On September 30, 1981, Judge Ziegler dismissed Al-Khazraji's Title VII claim as untimely, relying on *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). *Al-Khazraji v. Saint Francis College,* 523 F.Supp. 386 (W.D.Pa.1981). Having dismissed the Title VII claim, Judge Ziegler also dismissed the ancillary 42 U.S.C. § 1985(3) claim. However, he retained Al-Khazraji's 42 U.S.C. §§ 1981 and 1983 claims and the pendent state law claims. Defendants had argued that these federal claims were barred by statutes of limitations. Judge Ziegler disagreed, and, following *Davis v. United States Steel Supply,* 581 F.2d 335 (3d Cir. 1978), applied a six-year statute of limitations to both actions.

Judge Ziegler refused to view the Section 1981 claim as raising only a claim of discrimination based on national origin and not on race. Ziegler read Al-Khazraji's complaint as alleging that Al-Khazraji was denied tenure because he was of the "Arabian" race.[4] He held that this could serve as the basis for a civil rights action under Section 1981. 523 F.Supp. at 391–92. Al-Khazraji's case thus went forward based on Sections 1981, 1983, and the pendent state law claims.

On August 30, 1982, and October 8, 1982, the District Court denied certain requests by Al-Khazraji for discovery of the Tenure Committee's reasons for denying tenure.

---

**4.** The district court was correct. Plaintiff's First Complaint, *pro se,* at Paragraph 7, alleges that "[defendants'] unlawful employment policy and practice consisted of refusing to renew the full-time faculty appointment of Majid G. Al-Khazraji, Ph.D., because of national origin, religion and/or race...." Paragraph 8 alleges that defendants' conduct has deprived plaintiff of "equal employment opportunity and otherwise adversely affect[ed] his status as an employee because of his national origin, religion, and/or race." Plaintiff's second amended complaint, *pro se,* at Paragraph 7 alleges that "[Defendants are] depriving him of his Civil Rights ... because of his national origin (Iraq), religion (Muslim) and/or race (Arabian)." The plaintiff's third complaint, which raised the Section

1981 charge, did not repeat the allegation of racial motivation. However, as Judge Ziegler observed, "[a]lthough the exact word 'race' may not appear in plaintiff's third complaint, which raised the claim under 42 U.S.C. Section 1981, plaintiff's position from the outset has been that he was subject to disparate treatment because of 'national origin, religion, and/or race.' We therefore decline to dismiss plaintiff's action under Section 1981 simply because he omitted the word 'race' in his third complaint. In our view, it is a technical defect of little significance. The thrust of plaintiff's claims, namely, that he was denied tenure by St. Francis College because he is an Arabian born in Iraq, is clear to all concerned ..." 523 F.Supp. at 391–92.

On November 28, 1984, defendants moved for summary judgment on the remaining issues in the case. On March 12, 1985, Judge Mencer granted summary judgment for defendants. Judge Mencer held that Al-Khazraji had not made out a *prima facie* case under Section 1981 because, since 1978, the only other person to receive tenure in the Department of Behavioral Science at St. Francis was Al-Khazraji's wife. Additionally, Judge Mencer held that a claim of discrimination on the basis of being an Arab is not cognizable under Section 1981.

Judge Mencer also dismissed the Section 1983 claim for lack of action taken under color of state law. Having dismissed the federal claims, Judge Mencer dismissed the pendent state law claims. Al-Khazraji appealed. Defendants raise a number of arguments supporting affirmance. These will be discussed seriatim.

## IV.

### A. *RES JUDICATA*

■ The Rules of Decision Act, 28 U.S.C. § 1652 requires federal courts to give a prior state court judgment the same *res judicata* effect as would be provided by the courts of that state. *Migra v. Warren City School District*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Ligas v. City of Pittsburgh*, 765 F.2d 53 (3d Cir.1985). Appellees argue that Al-Khazraji's suit in federal court is *res judicata* because of the prior state court and PHRC actions filed by Al-Khazraji. Neither contention is persuasive.

### 1. *Effect of The State Court Action*

■ Al-Khazraji's state court action never proceeded to a judgment on the merits. Rather, pursuant to Cambria County Court of Common Pleas Rule of Court No. 33, the action was dismissed for failure to prosecute.[5] Pennsylvania courts give no *res ju-*

*dicata* effect to a dismissal for failure to prosecute. *See e.g.*, *Robinson v. Trenton Dressed Poultry Co.*, 344 Pa.Super. 545, 496 A.2d 1240 (1985); *Bon Homme Richard Restaurants, Inc. v. Three Rivers Bank and Trust Company*, 298 Pa.Super. 454, 444 A.2d 1272 (1982). Thus, the state court action is not *res judicata* to this suit.

### 2. *Effect of PHRC Dismissal*

■ The Pennsylvania Human Relations Act, 43 P.S. § 962(c), states:

In cases involving a claim of discrimination, if complainant invokes the procedures set forth in this act, that individual's right of action in the courts of the Commonwealth shall not be foreclosed. If within one (1) year after the filing of a complaint with the Commission, the Commission dismisses the complaint ... the Commission must so notify the complainant. *On receipt of such a notice the complainant shall be able to bring an action in the courts of common pleas of the Commonwealth based on the right to be free from discrimination granted by this act....*

42 P.S. § 962(c) (emphasis added).

Appellees have not rebutted the clear statement in Section 962(c) that a dismissal by the PHRC does not foreclose resort to state courts. *See Nestor v. Quaker State Coca-Cola Bottling Company*, 579 F.Supp. 289 (W.D.Pa.1984); *Fye v. Central Transportation Inc.*, 487 Pa. 137, 409 A.2d 2 (1979). Moreover, the letter received by Al-Khazraji from the PHRC dismissing his complaint read, in part: "In addition, the Pennsylvania Human Relations Act as Amended by Act 318, provides that upon receipt of this official notice, you may engage a private attorney as soon as possible and bring an action in the Court of Common Pleas for a judicial determination of your allegations of discrimination."

---

**5.** "The prothonotary shall list ... civil matters in which no steps or proceedings have been taken for two years or more prior thereto.... If no action is taken or no written objection is docketed in such matter prior to the general call

on the first day of such court, the prothonotary shall strike the matter from the list and enter an order as of course dismissing the matter with prejudice for failure to prosecute, under the provisions of this rule."

As a dismissal by PHRC does not foreclose resort to state courts, it does not foreclose resort to federal courts. *See Kremer v. Chemical Construction Corporation*, 456 U.S. 461, 470 n. 7, 102 S.Ct. 1883, 1891 n. 7, 72 L.Ed.2d 262 (1982).

## B. *STATUTE OF LIMITATIONS*

### 1. *Title VII*

Judge Ziegler, following *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), had dismissed Al-Khazraji's Title VII claims as untimely.[6] Subsequently, Al-Khazraji filed a motion with Judge Mencer, requesting reconsideration of that determination, and arguing that *Ricks* should not be applied retroactively.[7] Appellant does not dispute that *Ricks*, if applied retroactively, effectively forecloses his Title VII claim.

■ The presumption that the holding of a case will be applied retroactively as well as prospectively is merely a corollary of the principle that federal courts should apply the law in effect at the time that cases are adjudicated. *Gulf Offshore Company v. Mobil Oil Corporation*, 453 U.S. 473, 486 n. 16, 101 S.Ct. 2870, 2879 n. 16, 69 L.Ed.2d 784 (1981); *Scott v. Local 863, International Brotherhood of Teamsters*, 725 F.2d 226, 228 (3d Cir.1984).

■ The district court did not err in applying *Ricks* to appellant's case. The Supreme Court applied the rule of law announced in *Ricks* retroactively both to Ricks himself and in *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981). *Ricks*, of course, arose in this Circuit. Appellant has not pointed to any point of distinction between him and Mr. Ricks to justify retroactive application of the *Ricks* principle to Ricks and not to Al-Khazraji. *See Vuksta v. Bethlehem Steel Corp.*, 540 F.Supp. 1276, 1278 (E.D. Pa.1982), *affirmed* 707 F.2d 1405 (3d Cir.), *cert. denied* 464 U.S. 835, 104 S.Ct. 121, 78 L.Ed.2d 119 (1983) (applying *Ricks* retroactively to cause of action arising in September, 1977).

■ Furthermore, *Chevron Oil Co. v. Hudson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), which discusses the criteria for deciding whether to except a particular holding from the presumption favoring retroactivity, favors retroactive application of *Ricks. See Fitzgerald v. Larson*, 769 F.2d 160 (3d Cir.1985); *Smith v. City of Pittsburgh*, 764 F.2d 188 (3d Cir.), *cert. denied* — U.S. ——, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). We need only discuss the first step of the *Chevron* analysis. In order to justify nonretroactive application, the judicial decision must announce a new principle of law that either overrules clear past precedent or decides an issue of first impression whose resolution was not clearly foreshadowed. *Chevron*, 404 U.S. at 106–07, 92 S.Ct. at 355.[8]

■ When evaluating the state of the prior law, it is necessary to look to the time when the plaintiff's cause of action arose. If there is a clear precedent at that time upon which plaintiff might reasonably have relied in delaying suit, it is unfair to over-

---

**6.** *Ricks* held that in refusal to tenure cases, for purposes of both Section 1981 and Title VII, the act of discrimination is the making of the tenure decision and its communication to the teacher. This is true even if the teacher pursues internal grievance procedures and even if one of the effects of the denial of tenure—the eventual loss of the teaching position—does not occur until later. "[E]ntertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any way tentative. The grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made." 449 U.S. at 261, 101 S.Ct. at 505.

**7.** At oral argument before this court, Al-Khazraji argued that defendants are estopped from raising the statute of limitations by principles of equitable estoppel. This was not argued to Judge Ziegler, and at that time, there was no factual basis for estoppel in the record. Our review, of course, is confined to the record as it existed before Judge Ziegler when he dismissed the Title VII claim.

**8.** See pp. 513–16 *infra* for further discussion of the *Chevron* analysis.

turn that reliance after it is too late for the plaintiff to do anything about it.

The *Ricks* case originated in the District of Delaware. Prior to the Third Circuit's decision in *Ricks v. Delaware State College,* 605 F.2d 710 (3d Cir.1979), *reversed* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), there was no precedent in this Circuit on which appellant could reasonably have relied. The Third Circuit opinion was issued on September 18, 1979, eighteen months after the initial tenure decision had been communicated to appellant.

The clearest example of the state of the law on this matter at the time Al-Khazraji's claim arose is the District Court opinion in *Ricks,* 22 BNA FEP Cases 788 (D.Del. 1978), *motion for reconsideration denied,* 22 BNA FEP Cases 793 (D.Del.1978), *rev'd,* 605 F.2d 710 (3d Cir.1978), *rev'd* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (*aff'g* district court). The district court judge there found that *Meyers v. Penny-pack Woods Home Ownership Association,* 559 F.2d 894 (3d Cir.1977), a case arising under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* controlled. He read *Meyers* as leading to the conclusion that the alleged discriminatory acts at issue were the denial of tenure and the award of the terminal contract, not the subsequent termination of employment.

*Bonham v. Dresser Industries, Inc.,* 569 F.2d 187 (3d Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), cited by Al-Khazraji, could not have provided him with any assurance that his final day of employment would be considered as the unlawful employment practice for Title VII. *See Ricks v. Delaware State College,* 22 FEP Cases 793 (D.Del.1978) (discussing why *Bonham* does not apply).

Thus, Al-Khazraji cannot claim that, prior to the Third Circuit's decision in *Ricks,* there was any clear precedent on which he could have relied in delaying to file his federal action. Because Appellant had no grounds for reasonable reliance on a contrary rule, it is not inequitable to apply *Ricks* retrospectively.

2. *The Section 1981 Claim Against Appellee St. Francis College*

a. *Retroactive Application of Goodman v. Lukens Steel*

Appellees contend that Al-Khazraji's Section 1981 claim is barred by the statute of limitations. We disagree.

■ Because Section 1981 refers to no specific federal limitations period, federal courts are obligated to borrow the state limitations period which is applied to the state cause of action most analogous to the civil rights cause of action, so long as it is not deleterious to the federal rights involved. *Johnson v. Railway Express Agency,* 421 U.S. 454, 464-65, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975); *See Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980); *Swietlowich v. County of Bucks,* 610 F.2d 1157, 1162 (3d Cir.1979).

This Circuit, from at least 1977 until 1985, had applied Pennsylvania's six-year statute of limitations in discrimination cases brought under Section 1981. *See Meyers v. Pennypack Woods Home Ownership Association,* 559 F.2d 894 (3d Cir. 1977); *Wilson v. Sharon Steel Corporation,* 549 F.2d 276 (3d Cir.1977). Judge Ziegler, in his opinion below, properly applied the six-year limitations period to plaintiff's claim. Neither he nor this court foresaw the Supreme Court's recent ruling in *Wilson v. Garcia,* —— U.S. ——, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). *See Goodman v. Lukens Steel,* 777 F.2d 113, 118 (3d Cir.1985).

However, *Wilson v. Garcia* has made it necessary for this court to re-examine its prior decisions. Consequently, in *Goodman,* we held that the Supreme Court's ruling mandated that Pennsylvania's statute of limitations for personal injuries be applied to actions brought under Section 1981. This is a two-year statute of limitations. 42 Pa.C.S.A. § 5524.

As noted above, the general presumption is that federal courts should apply the law in effect at the time that cases are adjudi-

cated. *Gulf Offshore Company*, 453 U.S. at 486 n. 16, 101 S.Ct. at 2879 n. 16; *Scott*, 725 F.2d at 228.

*Chevron Oil Co. v. Hudson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), sets forth the criteria for deciding whether to apply retroactively the holding of a case. *See Fitzgerald v. Larson*, 769 F.2d 160 (3d Cir.1985); *Smith v. City of Pittsburgh*, 764 F.2d 188 (3d Cir.) *cert. denied* — U.S. ——, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). *Chevron* requires the federal courts to undertake a three-part analysis:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retrospective application, for [w]here a decision of this Court could produce substantially inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted).

We must evaluate these three factors in light of Al-Khazraji's claim.

#### i. *The Change from Prior Law*

The first *Chevron* factor requires that the prior law have been sufficiently clear that the plaintiff could have reasonably relied upon it in delaying suit. *Fitzgerald v. Larson*, 769 F.2d at 163. In 1973, when the complaint was filed in the *Goodman*

case, there was no established precedent in the Third Circuit to indicate the appropriate limitations period for Section 1981 claims.[9] However, when the cause of action in Al-Khazraji's case arose, in early 1978, this was no longer true.

In *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894 (3d Cir. 1977) the Third Circuit definitively applied Pennsylvania's six-year statute of limitations to a Section 1981 action. *Meyers* concerned a racially-motivated refusal to sell a house to plaintiff, a black man. The Court analogized Meyers' claim to a tort action involving "the wrongful interference with another's financial, commercial, or business rights. A victim of one of these torts suffers not so much from an emotional or mental trauma as he does from the actual denial of his right to lawfully pursue his business, employment, or personal affairs. Meyers appears to complain of just such a denial." 559 F.2d at 902. Having reached this conclusion, the court had no trouble in identifying the related six-year statute of limitations for contract actions and applying it to Meyers' claims. *Id.* at 903; *See Wilson v. Sharon Steel Company*, 549 F.2d 276 (3d Cir.1977); *Collier v. Philadelphia Gas Works*, 441 F.Supp. 1208, 1212 (E.D.Pa.1977); *Pierce v. Catalytic*, 430 F.Supp. 1180, 1182 (E.D.Pa.1977).

After *Meyers* and *Wilson*, a potential plaintiff whose complaint was based on "the denial of his right to lawfully pursue his ... employment" could be fairly confident that a federal court in this Circuit would apply Pennsylvania's six-year statute of limitations to his or her section 1981 claim.

Although there were some earlier cases that borrowed a shorter limitations period for Section 1981 actions, *see Wilson v. Sharon Steel Corporation*, 399 F.Supp. 403 (W.D.Pa.1975), *rev'd* 549 F.2d 276 (3d

---

**9.** The cause of action that was the basis for the *Goodman* case arose in May, 1970. *Goodman*, 777 F.2d at 121 n. 4. The conclusion that *Goodman* is to be retroactively applied to the plaintiff in *Goodman* itself does not mandate that *Goodman* be retroactively applied to this plaintiff. The crucial distinction between the situation in *Goodman* and that involved here is the relative clarity of this Circuit's law regarding the proper limitations period. In 1970, that law was not clear. However, as discussed below, this had changed by the time Al-Khazraji's claim arose.

Cir.1977); *Davis v. United States Steel Supply Company,* 405 F.Supp. 394 (W.D. Pa.1976), *rev'd* 581 F.2d 335 (3d Cir.1978); *Presseisen v. Swarthmore College,* 71 F.R.D. 34 (E.D.Pa 1976), by 1977 the district courts were uniformly applying the six-year limitations period for actions alleging interference with contractual rights. *See Collier,* 441 F.Supp. at 1212; *Groves v. Insurance Company of North America,* 433 F.Supp. 877, 884 (E.D.Pa.1977); *Pierce v. Catalytic, Inc.,* 430 F.Supp. at 1182; *see also Jones v. United Gas Improvement Corporation,* 383 F.Supp. 420, 430–31 (E.D.Pa 1974).

Just a few months after Al-Khazraji was informed of the Tenure Committee's decision, the Third Circuit, in *Davis v. United States Steel Supply,* 581 F.2d 335 (3d Cir. 1978), made it absolutely clear that the six-year limitations period for contract actions applied to Section 1981 actions brought to redress employment discrimination. *See Liotta v. National Forge Company,* 629 F.2d 903, 906 (3d Cir.1980), *cert. denied* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981); *Skehan v. Board of Trustees of Bloomsburg State College,* 590 F.2d 470 (3d Cir.1978), *cert. denied* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979). Thus, unlike the state of the law regarding the proper limitations period for Section 1983 actions, in early 1978 the precedents were sufficiently clear that Al-Khazraji could reasonably have relied upon them when deciding to delay filing his Section 1981 claim. *Compare Smith v. City of Pittsburgh,* 764 F.2d 188 (3d Cir.1985).[10]

For this reason, when the *Goodman* case was decided, it established a new principle of law and overruled clear past precedent on which litigants reasonably could have relied. When Appellant allegedly was discriminated against, and for several years

after he had initiated his federal action, these decisions represented the law governing his case. "It cannot be assumed that he did or could foresee that this consistent interpretation ... would be overturned. The most he could do was to rely on the law as it then was. 'We should not indulge in the fiction that the law now announced has always been the law and, therefore, that those who did not avail themselves of it waived their rights.' *Griffin v. Illinois,* 351 U.S. 12, 26 [76 S.Ct. 585, 594, 100 L.Ed. 891] (Frankfurter, J., concurring in the judgment)." *Chevron,* 404 U.S. at 107, 92 S.Ct. at 355.

### ii.  *The Purposes of Goodman*

*Wilson v. Garcia,* —— U.S. ——, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), made the *Goodman* decision inevitable. In *Smith v. City of Pittsburgh,* 764 F.2d 188 (3d Cir.) *cert. denied* —— U.S. ——, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985), we analyzed the purposes of *Wilson* and concluded that it was intended to promote uniformity and the minimization of unnecessary litigation. 764 F.2d at 196. *Smith* found that the policies informing *Wilson* did not militate clearly either in favor of or against retroactive application. *Id.* *See Fitzgerald v. Larsen,* 769 F.2d at 164. The purposes of *Goodman* are the same as those of *Wilson v. Garcia.* Consequently, *Goodman* also is neutral in resolving this question.

### iii.  *The Equities of Retroactive Application of Goodman*

The third *Chevron* factor is whether retroactive application will achieve harsh, unjust, or inequitable results. *Fitzgerald,* 769 F.2d at 164. In *Fitzgerald,* Judge Sloviter observed that this factor overlaps with the first *Chevron* factor, for it would be inequitable to give retroactive applica-

---

**10.** The 1978 change in the Pennsylvania law does not affect this conclusion. Effective June 27, 1978, a new statute of limitations went into effect in Pennsylvania. 42 Pa.C.S. Section 5527, which set forth a six-year limitations period for actions upon a contract, did not change the limitations period applicable under the prior law. 12 P.S. Section 31 (repealed). As Judge

Ziegler noted below, there was nothing in the change to suggest that Pennsylvania intended that a shorter limitations period be substituted for the six-year period that formerly had applied to actions for breach of employment. 523 F.Supp. at 389–90; *See Ulloa v. City of Philadelphia,* 95 F.R.D. 109, 114 (E.D.Pa.1982).

tion to a "shortening of the limitations period that altered established law upon which plaintiff could have reasonably relied." *Id.*

We have already decided that retroactive application of *Goodman* would defeat the reasonable expectations of those, like Al-Khazraji, who relied upon the *Davis* line of cases. "[I]t would produce the most 'substantial inequitable results' to hold that [Appellant] 'slept on his rights' at a time when he could not have known the time limitation that the law imposed on him." *Chevron,* 404 U.S. at 108, 92 S.Ct. at 356 (citation omitted). Al-Khazraji's position is even more compelling. In 1981, because the district court applied the clear pre-*Goodman* rule, Al-Khazraji survived defendants' motion to dismiss the Section 1981 claims as untimely under a two-year statute of limitations. 523 F.Supp. at 386. If Judge Ziegler had ruled differently and then dismissed the pendent state claims, Al-Khazraji perhaps would not have permitted the state court *non pros* to be entered. Retroactive application of *Goodman* would probably compel dismissal of those pendent claims, as Section 1981 is the only federal cause of action left to Al-Khazraji. However, it may be too late for Al-Khazraji to rescue his state lawsuit. Because we cannot say whether Pennsylvania would permit him to reinstate that suit in state court, it seems possible that this might prevent him from litigating those claims. This seems to be a harsh result.

### iv. *Goodman Is Not To Be Applied Retroactively to Al-Khazraji's Section 1981 Claim*

■ Because we find two of three *Chevron* factors present and the third neutral on this issue, we hold that, at least as to persons whose causes of action arose after 1977, *Goodman* should not be applied retroactively to alter the applicable Pennsylvania statute of limitations from six to two years. Thus, Al-Khazraji's federal

lawsuit, filed in 1980, was timely. *Accord Elliott v. Group Medical and Surgical Care,* 714 F.2d 556, 563 (5th Cir.1983), *cert. denied* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984) (New judge-made rules on limitations are usually not to be applied retroactively to a plaintiff who timely filed his complaint under the then-existing law of limitations).

### C. *THE SECTION 1981 CLAIM*

#### 1. *Race and The Section 1981 Claim*

Defendants next argue that Plaintiff may not sue under Section 1981 because Arabs are not a "protected minority." They argue that an ethnic Arab is taxonomically a Caucasian and therefore "not a protected person under Section 1981 when he is presumably claiming other Caucasians or whites were improperly favored over him."

■ We disagree and hold that ethnic Arabs may depend upon Section 1981 to remedy racial discrimination against them.[11]

The starting point of our analysis is the statute itself. 42 U.S.C. § 1981 provides that:

All persons within the Jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The defendants argue that because Arabs are taxonomically Caucasians, they are therefore "white citizens" for purpose of Section 1981 and *a fortiori,* Section 1981 offers them no greater protection than they enjoy absent Section 1981.

---

**11.** We do not reach the issue of Section 1981's applicability to claims of national origin discrimination. When the record is fully devel-

oped, it may or may not be necessary for the district court to address that issue.

The Supreme Court has ruled that individuals who are not black, but who have been victims of racial discrimination can sue under Section 1981. *McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). *McDonald* rejected the argument that Section 1981 is limited to the protection of nonwhites against racial discrimination. 427 U.S. at 287–96, 96 S.Ct. at 2582–86. The protection against racial discrimination thus extends beyond those who are taxonomically members of the Negro race. Appellant is therefore not prevented from invoking Section 1981 merely because he is taxonomically classified as a member of the Caucasian race. *Compare LaFore v. Emblem Tape and Label Company*, 448 F.Supp. 824, 826 (D.Col.1978) (equating "white citizens" with a racial classification is "utterly lacking in sophistication. There is no scientific justification for the equation."). However, the Supreme Court did not make clear how the lower courts were to recognize the sort of discrimination proscribed by Section 1981.[12] Therefore, we turn for guidance to the legislative history.

Section 1981 was originally enacted as part of Section 1 of the Civil Rights Act of 1866, authorized by Section 2 of the thirteenth amendment to the United States Constitution. Because of doubts over Congress's authority to pass the Civil Rights Act of 1866, it was subsequently reenacted following the adoption of the fourteenth amendment as Section 18 of the Civil Rights Act of 1870, c. 114 Section 18, 16 Stat. 144 (May 31, 1870). *See Jones v. United Gas Improvement Corporation*, 68 F.R.D. 1, 10–11 (E.D.Pa.1975). Accordingly, Section 1981 has some ties to the fourteenth as well as to the thirteenth amendment. *Croker v. Boeing Company*, 662 F.2d 975 (3d Cir., 1981).

The Civil Rights Act of 1866 was directed primarily against the mistreatment of blacks by private individuals. *See Jones v. Alfred H. Mayer Company*, 392 U.S. 409, 427–28, 88 S.Ct. 2186, 2197, 20 L.Ed.2d 1189 (1968). Nevertheless, the bill was designed to ensure a more encompassing protection. Senator Trumbell introduced the bill as a measure "to protect *all persons* in the United States in their civil rights ..." Cong.Globe, 39th Congress, 1st Sess., 211 (1866) (emphasis added). Senator Trumbell described the bill as applying to "every race and color." *Id. See also McDonald*, 427 U.S. at 288 n. 19, 96 S.Ct. at 2582 n. 19. Senator Howard described the bill's object as to give "to persons who are of different races or colors the same civil rights." Cong.Globe, 39th Congress, 1st Sess., at 504.

In The House of Representatives, Representative Wilson argued for passage of the bill on the grounds that it would "protect our citizens, from the highest to the lowest, from the whitest to the blackest, in the enjoyment of the great fundamental rights which belong to all men." Cong.Globe, 39th Cong., 1st Sess. at 1118. He claimed that the bill would ensure "the equality of citizens ... in the enjoyment of 'civil rights and immunities,'" and "secure[ ] to citizens of the United States equality in the exemptions of the law.... Whatever exemptions there may be shall apply to all citizens alike. One race shall not be more favored in this respect than another." Cong.Globe, 39th Cong., 1st Sess. at 1117. *See* remarks of Senator Hendricks, *Id.* at 601; Remarks of Representative Shallabarger, *Id.* at 1293; *see also Jones*, 392 U.S. at 436, 88 S.Ct. at 2201 ("[T]he Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of state law, with respect to the rights enumerated therein").

It was the measure's breadth that led to the amendment of the bill to include the limitation of the rights to those enjoyed by white citizens. Representative Wilson, who proposed the amendment, Cong.Globe, 39th Cong., 1st Sess. at 1115, explained the

---

12. The Supreme Court, while it has often stated that Section 1981 exists to remedy racial discrimination, has never precisely defined its conception of "race." *See Johnson*, 421 U.S. at 459–60, 95 S.Ct. at 1719–20; *McDonald*, 427 U.S. at 287, 96 S.Ct. at 2582; *Jones*, 392 U.S. at 413, 88 S.Ct. at 2189; *Georgia v. Rachel*, 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966).

purpose of the amendment was to avoid extending these rights to "all citizens, whether male or female, majors or minors." *Id.* at App. 157, *quoted in McDonald,* 427 U.S. at 293, 96 S.Ct. at 2585. The Supreme Court has observed that this amendment "indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality." *Georgia v. Rachel,* 384 U.S. 780, 791–92, 86 S.Ct. 1783, 1789–90, 16 L.Ed.2d 925 (1966); *see Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975) ("Section 1981 affords a federal remedy against private discrimination on the basis of race").

Representative Shallabarger stated that the effect of the amended bill was:

> to require that whatever rights as to each of those enumerated civil ... matters the States may confer upon one race or color of the citizens shall be held by all races in equality. Your state may deprive women of the right to sue or contract or testify, and children from doing the same. But if you do so, or do not so as to one race, you shall treat the other likewise.... It secures—not to all citizens, but to all races as races who are citizens—equality of protection in those enumerated civil rights which the States may deem proper to confer upon any races.

Cong.Globe at 1293.

Representative Shallabarger's discussion of the bill made it clear that he was not using the terms "race" or "color" in a crabbed fashion or to signify only those races identified by anthropologists as distinct. Cong.Globe, 39th Cong., 1st Sess., at 1294. Shallabarger's conception of the bill's scope was much broader, and clearly not limited to a taxonomic definition of the key term in the bill.

> Who will say that Ohio can pass a law enacting that no man of the German race, and whom the United States has made a citizen of the United States, shall ever own any property in Ohio, or shall ever make a contract in Ohio.... If Ohio may pass such a law, and exclude a German Citizen, not because he is a bad man or has been guilty of a crime, but because he is of the German nationality or race, then may every other state do so; and you have the spectacle of an American Citizen admitted to all its high privileges and entitled to the protection of his Government in each of these rights, and bound to surrender life and property for its defense, and yet that citizen is not entitled to either contract, inherit, own property, work, or live upon a single spot of the Republic, nor to breathe its air.

*Id.*

This review of the legislative history convinces this court that Congress did not intend to limit Section 1981 solely to those who could demonstrate that they had been discriminated against because they belonged to a particular group identified and described by anthropologists. When Congress referred in the statute to "race," it plainly did not intend thereby to refer courts to any particular scientific conception of the term. In fact, there is no precise definition of the word.[13]

---

13. The dictionary provides an example of the lack of precision in the term.

Race. A group of persons, animals, or plants, connected by common descent or origin; a tribe, nation, or people, regarded as of common stock; a group of several tribes or peoples, forming a distinct ethnical stock; one of the great divisions of mankind, having certain physical peculiarities in common. 2 OXFORD ENGLISH DICTIONARY 2400 (1971, Compact Ed.).

Race. 1. Any of the different varieties of mankind, distinguished by form of hair, color of skin and eyes, stature, bodily proportions, etc.: many anthropologists now consider that there are only three primary major groups, the Caucasoid, Negroid, and Mongoloid, each with various subdivisions (sometimes also called *races*): the term has acquired so many unscientific connotations that in this sense it is often replaced in scientific usage by *ethnic stock* or *group.*
2. a population that differs from others in the relative frequency of some gene or genes...
3. any geographical, national, or tribal ethnic grouping....

We believe that Congress's purpose was to ensure that all persons be treated equally, without regard to color or race, which we understand to embrace, at the least, membership in a group that is ethnically and physiognomically distinctive.[14]

Some courts, in struggling with this definitional problem, have concluded that it is impossible to distinguish "race" from considerations of "national origin." This is because they have concluded that "[t]he notion of race is a taxonomic device and, as with all such constructs, it exists in the human mind [and] not as a division in the objective universe." *Ortiz v. Bank of America*, 547 F.Supp. 550, 565 (E.D.Calif. 1982). Thus, in their view, the separation of *homo sapiens* into subgroups is largely determined by the reasons for the separation.[15]

While the distinction between racial discrimination, which is cognizable under Section 1981, and other types of discrimination, which may not be cognizable, may in some instances be obscure, that cannot justify refusing to attempt the distinction.

Discrimination based on race seems, at a minimum, to involve discrimination directed against an individual because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of *homo sapiens.*

Because Al-Khazraji was unable to conduct full discovery prior to the defendants' motion for summary judgment, we do not have before us a sufficient record to determine whether he has been subjected to the sort of prejudice that Section 1981 would redress as being impermissibly racially-based.[16] However, where a plaintiff comes into federal court and claims that he has been discriminated against because of his race, we will not force him first to prove his pedigree. We are unwilling to assert that Arabs cannot be the victims of racial prejudice: "prejudice is as irrational as is the selection of groups against whom it is directed. It is thus a matter of practice or attitude in the community, it is a usage or image based on all the mistaken concepts of 'race.'" *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968 (10th Cir.1979).[17]

5. any group of people having the same activities, habits, ideas, etc. WEBSTER'S NEW WORLD DICTIONARY 1169 (1972 Ed.)

**14.** *See Gonzalez v. Stanford Engineering, Inc.*, 597 F.2d 1298, 1300 (9th Cir.1979): "A substantial portion of the Mexican population traces its roots to a mixture of the Caucasian (Spanish) and Native American races. With this background prejudice towards those of Mexican descent having a skin color not characteristically Caucasian must be said to be racial prejudice under 1981." But see *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 970 (10th Cir.1979). (Though Mexican Americans not technically another race, community attitudes differentiating Hispanics from "Anglos" are sufficient to bring care within Section 1981 because these attitudes are enough like racial prejudice.)

**15.** "Just what constitutes a race is a hard question to answer, since one's classification usually depends on the purpose of classification." Thus a group of scientists after developing a list of "racial types" emphasized that the list "of 30 'races' might have been ten or 50; the line of discrimination in many cases is arbitrary.... If this list does nothing else, we hope that it will bring home to the student the realization that race is not a static thing at all...." *Ortiz*, 547 F.Supp. at 565 (citations omitted). *See Cubas v. Rapid American Corp.*, 420 F.Supp. 663, 666 n. 2

(E.D.Pa.1976), *compare Anooya v. Hilton Hotels Corporation*, 733 F.2d 48 (7th Cir.1984) (absent allegation of racial animus, national origin discrimination not cognizable under Section 1981); *Budinsky v. Corning Glass Works*, 425 F.Supp. 786, 788–89 (W.D.Pa.1977).

**16.** Appellant has appealed certain of the district court's discovery rulings. On remand, the District Court should reconsider those rulings in light of this court's recent decision in *Equal Employment Opportunity Commission v. Franklin and Marshall College*, 775 F.2d 110 (3d Cir. 1985).

**17.** Other courts have allowed "non-traditional" Section 1981 plaintiffs to raise claims of race discrimination. *See, e.g., Gonzalez v. Stanford Applied Engineering*, 597 F.2d 1298 (9th Cir. 1979) (plaintiff of Mexican descent having skin color "not characteristically Caucasian"); *Banker v. Time Chemical, Inc.*, 579 F.Supp. 1183 (N.D.Ill.1983) (East Indian); *Pollard v. City of Hartford*, 539 F.Supp. 1156 (D.C.Conn.1982) (Hispanic); *Baruah v. Young*, 536 F.Supp. 356 (D.M.D.1982) (Native of India having skin color not characteristically white); *Aponte v. National Steel Service Center*, 500 F.Supp. 198 (N.D.Ill. 1980) (Mexican-American); *Tayyari v. New Mexico State University*, 495 F.Supp. 1365 (D.N.M. 1980) (Iranian); *Khawaja v. Wyatt*, 494 F.Supp.

Accordingly, Al-Khazraji should be allowed the opportunity to prove that the discrimination he alleges is racially motivated within the meaning of Section 1981.

### 2. Liability of the Individual Defendants Under Section 1981

The district court found that the individual defendants, who are members of the tenure committee, are not the employers of plaintiff and so cannot be sued under Section 1981 or on the pendent state claims. We disagree. Although Section 1981 is a federal civil rights remedy it is in the nature of a tort remedy. *Goodman*, 777 F.2d at 119–20.

■ An individual, including a director, officer, or agent of a corporation, may be liable for injuries suffered by third parties because of his torts, regardless of whether he acted on his own account or on behalf of the corporation. "An officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefore." *Zubik v. Zubik*, 384 F.2d 267, 275–76 (3d Cir.1967), *cert. denied* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). *See* Restatement (Second) of Agency § 343 (1957).

■ In particular, directors, officers, and employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by Section 1981, regardless of whether the corporation may also be held liable. *See Tillman v. Wheaton-Haven Recreation Association*, 517 F.2d 1141, 1146 (4th Cir.1975); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir.), *cert. denied* 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975); *See also Weaver v. Gross*, 605 F.Supp. 210, 212–13 (D.D.Col.1985); *Gladden v. Barry*, 558 F.Supp. 676, 678 (D.D.

Col.1983); *Jeter v. Boswell*, 554 F.Supp. 946, 951–53 (N.D.W.Va.1983).

■ If individuals are personally involved in the discrimination against the Appellant, and if they intentionally caused the College to infringe on Appellant's Section 1981 rights, or if they authorized, directed, or participated in the alleged discriminatory conduct, they may be held liable. *See Manuel v. International Harvester Company*, 502 F.Supp. 45 (N.D.Ill.1980); *Coley v. M & M Mars, Inc.*, 461 F.Supp. 1073 (M.D.Ga.1978); *see also Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 236–37, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (Section 1982 suit permitted against corporation and its directors).

### D. PENDENT STATE CLAIMS

After dismissing Al-Khazraji's federal claims and thereby eliminating the basis for pendent jurisdiction, the District Court dismissed the pendent state claims. Because we are reinstating appellant's Section 1981 claim, upon remand the district court must reconsider the pendent state claims. When the district court dismissed the pendent claims, it expressed, in dictum, its views on the merits of the pendent claims.

The district court believed that, because the individual members of the Tenure Committee were not the appellant's employer, they could not be liable to appellant for breach of an employment contract, for intentional infliction of emotional distress, or for violations of the Pennsylvania Human Relations Act.

■ We agree that because the individual members of the tenure committee were not parties to any employment contract between Al-Khazraji and St. Francis College, they may not be sued on the contract for

302 (W.D.N.Y.1980) (Pakastani-American); *Lopez v. Sears, Roebuck & Co.*, 493 F.Supp. 801 (D.M.D.1980) (non-white (brown) Spanish surnamed Malay); *Ridgeway v. Inter. Broth. of Elec. Wkrs.* 466 F.Supp. 595 (N.D.Ill.1979) (Hispanic); *Cubas v. Rapid American Corp.*, 420 F.Supp. 663 (E.D.Pa.1976) (Cuban-American); *Miranda v. Amalgamated Clothing Workers*, 8

CCH EPD ¶ 9601, BNA FEP Cases 557 (D.N.J. 1974) (Puerto Rican). *Compare Budinsky v. Corning Glass Works*, 425 F.Supp. 786 (W.D.Pa. 1977) (plaintiff of Slavic national origin not able to state a cause of action for race discrimination); *Kurylas v. United States Dept. of Agriculture*, 373 F.Supp. 1072 (D.D.C.1974) aff'd 514 F.2d 894 (D.C.Cir.1975) (same-Polish American).

breach. However, Al-Khazraji has not alleged breach of contract against these individuals.[18]

However, we do not agree that the individual defendants, merely because they were not Al-Khazraji's employer, cannot under any circumstances be liable for intentional infliction of emotional distress. This tort does not require contractual privity. *See Bruffett v. Warner Communications, Inc.*, 692 F.2d 910, 914 (3d Cir.1982).[19] Our understanding of the Pennsylvania Human Relations Act leads us to the same conclusion regarding it. *See* 43 P.S. §§ 955(e), 962(c).

### V.

The judgment of the district court will be reversed and the case remanded for proceedings consistent with this opinion.

ADAMS, Circuit Judge, concurring.

As a matter of social policy, I have no dispute with the panel's position: I wholeheartedly favor laws prohibiting all types of invidious discrimination. As a matter of legislative interpretation, however, I question the panel's conclusion in Part III(c)(1) that Congress, in enacting § 1981, intended that a plaintiff would be able to establish a claim based on anti-Iraqui or anti-Arab discrimination. I join in the panel's holding nonetheless because I believe it is a not-unreasonable alternative given the Supreme Court's interpretation of § 1981. I question that interpretation, however, and I also have strong reservations about the implications of today's decision, which in large part would seem to follow from the Supreme Court's construction.

Enacted in the aftermath of the Civil War, which was fought to a great extent over slavery, § 1981 was intended to place blacks on an equal footing with whites by prohibiting racial discrimination in private contracts. *See Jones v. Alfred H. Mayer Company*, 392 U.S. 409, 427–28, 88 S.Ct.

2186, 2197, 20 L.Ed.2d 1189 (1968). Based on my reading of the statute, its legislative history, and the broader historical context in which it was enacted, I am persuaded that Congress designed its protections to apply solely to blacks. Admittedly there may have been one or two congressmen like Representative Shallabarger, who wished to go further. But nothing in the legislative history indicates that such a stance represented the view of the majority in Congress.

An interpretation of § 1981 that would confine its coverage to blacks charging racial prejudice, however, would now seem to be precluded by *McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). There, the Supreme Court held that white plaintiffs seeking to challenge so-called reverse discrimination could maintain suit under § 1981. Rejecting the position that the Act was designed solely to protect blacks, the Court declared that the 39th Congress "was intent upon establishing in the federal law a broader principle than would have been necessary simply to meet the particular and immediate plight of the newly freed Negro slaves." *Id.* at 295, 96 S.Ct. at 2585. The prospect of discrimination against whites may have appeared highly unlikely at the time, the Supreme Court stated, yet the statute created a principle that prohibited such unequal treatment; "the Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *Id.* at 295, 96 S.Ct. at 2585.

*McDonald* does not directly control the case at hand, to be sure. It simply holds that § 1981 was intended to protect not only blacks but also members of other "races," and that white plaintiffs may therefore bring suit under it. The present case could be distinguished. Here, it might be argued, the plaintiff, although a Caucasian, does not claim to be discriminated

18. Appellant's Amended Complaint, Count III par. 49.

19. Upon remand, the parties may want to consider whether this count is time-barred, an issue on which we express no opinion. *See Bruffet*, 692 F.2d at 914.

against as a Caucasian, as in *McDonald;* rather, he alleges that he was discriminated against as an Arab or an Iraqui. And discrimination against Arabs or Iraquis, the argument would conclude, is not *racial* discrimination cognizable under § 1981.

The problem with this position is that it rests on a technical definition of race as black and white, or perhaps black, white and yellow, in keeping with the classic anthropological definition of race as the three major groups, Caucasoid, Negroid and Mongoloid. I agree with the panel that there is no evidence that Congress intended a narrow scientific definition of race when it passed § 1981. Moreover, adopting an anthropological definition would lead to anomalous results: while a white would be able to claim anti-white discrimination under the statute, for example, a Mexican-American or an Indian would be unable to make out a claim, unless they contended they were unfairly treated by virtue of being Caucasians.

Having rejected a narrow definition of race, the majority comes forward with a much broader one. Race, it concludes, means "membership in a group that is ethnically and physiognomically distinctive." Ante at 517. I do not believe the Court should be conducting this definitional exercise to begin with, because in my view § 1981 was designed solely to protect blacks. But since *McDonald* appears to have removed that option, and of necessity forces a selection of some definition of race, the one selected by the majority seems more sensible than the anthropological approach.

Yet it too leads to troubling results. Now, in any suit under § 1981, a jury may be asked to determine whether the plaintiff has been subjected to discrimination as a result of belonging to a group that is "ethnically and physiognomically distinctive" —a rather far cry from the language of, and the purpose behind, § 1981. Although the panel stops short of holding that national origin discrimination is encompassed by § 1981, virtually any nationality can be seen as ethnically and physiognomically distinctive. The result, I believe, constitutes a dramatic expansion in the number of plaintiffs who may now proceed under the statute, well beyond what Congress intended when it passed the law.[1] In effect, a statute aimed at racial discrimination is being converted into one also focused on national origin discrimination.

I agree that prohibiting private discrimination based on national origin, as Title VII expressly does, is salutary; indeed, prohibiting any type of invidious discrimination is salutary. I also realize that it may be tempting for federal judges to "interpret" the statute to achieve the desired result. Because we are not directly answerable to the voters, however, we are not well suited to make what is essentially a policy choice. That task, under our system of government, is assigned to Congress, the branch of government that is most representative of the people. And the more judges succumb to the temptation to make such policy choices under the guise of interpretation, the more we risk diminishing confidence in our judgments. In light of the Supreme Court's decision in *McDonald*, however, I am constrained to join the result reached by the panel.

---

1. In light of the continual flow of immigrants to the United States, the consequences of this expansion are quite substantial. Persons from most of the Middle East and Asia, for example, would now appear able to sue under § 1981. As of 1980, there were 2,539,800 persons born in Asia living in the United States, as well as 43,400 from Egypt and 71,500 from North Africa. United States Department of Commerce, Bureau of Census, *Statistical Abstract of the United States* (1985), at 87. I do not mean to suggest that this inflow is in any way undesirable; the figures, rather, point up the extent of the expansion of the statute, which underpins, I believe, the need for Congress, as opposed to the judiciary, to decide on the appropriateness of this result.